STOULIG, Judge.
Appellant, International Harvester Company (Harvester), has appealed a judgment ordering it to vacate the leased premises at 1601 Poydras Street in New Orleans; to remove the improvements; and to deliver possession to its lessor, Illinois Central Gulf Railroad Company (Illinois Central). Ap-pellee based its demand for eviction on two alleged lease violations, namely, subletting without the written consent of the lessor and permitting the sublessee to utilize the property for purposes other than those stipulated in the “exclusive use” provisions of the leases at issue.
By leases dated February 4, 1960 (# 15730)[1] and December 11, 1961 (# 15042), Illinois Central rented two contiguous tracts of land to Harvester for the continued operation of a truck retail outlet that had been carried on at that location since 1936 under earlier lease agreements. Harvester continued in business at this site until it relocated in 1974. In the interim between the execution of the leases and vacating the property, the Louisiana Super-dome was constructed across the street and the property greatly increased in value. Cancellation of the leases due to expire in 1986 would place at the railroad’s disposal an unencumbered $2,500,000 asset[2] that yielded a low return at the time this eviction proceeding was filed, while upholding the validity of the leases would be a financial windfall for Harvester. The litigants are large corporations that have acted with benefit of legal counsel throughout and there can be no question here that both lessor and lessee are dealing at arm’s length.
The provisions of the leases at issue, executed on forms furnished by the lessor railroad are:
“22. It is further agreed by the Lessee, not to underlet said premises, or any part thereof, or assign this Lease, without the written consent of the Lessor, first had and obtained.
* * * * * *
“25. If the rent above reserved, or any part thereof, shall be unpaid on the day when due, or if default shall be made *630 by the Lessee in keeping or performing any of the covenants or agreements herein contained, then this lease shall, at the election of the Lessor, be null and void and the term provided for herein shall be ended * * (Emphasis supplied.)
(The quoted part of these clauses are identical in both leases.)
Section 6 in the 15730 lease reads:
“It is further agreed by the Lessee, that the said leased premises shall be used and occupied exclusively as a site for a Storage space.”
Section 6 in the 15042 lease provided:
“It is further agreed by the Lessee, that the said leased premises shall be used and occupied exclusively as a site for a motor truck sales and service station and warehouse.”
The uses specified in both sections when combined provide for a retail truck sales and service outlet with a warehouse for inventory. The building presently is being operated as a public parking lot.
Germane to a determination of whether there was a lease violation warranting cancellation are a series of transactions that began July 16, 1974 with a letter of that date from David Fjnegold to Harvester executive Paul Nylander expressing an interest in subletting the vacated Poydras Street location to operate a parking lot. On January 17, 1975, after receiving several similar inquiries from Finegold, Nylander wrote a letter to Rixon Irvine, Illinois Central’s general manager of real estate, to advise Harvester had vacated and to request written permission to sublease to Finegold to operate a parking lot. On January 22, 1975, Irvine responded by letter that the proposed parking lot was not a use permitted by the contracts of lease and suggested a mutual cancellation of the agreements.
On March 14, 1975, Harvester’s legal representative J. J. Ross wrote a letter to Irvine stating he reviewed the Nylander-Ir-vine correspondence of January and he concluded the lessor’s refusal to agree to the sublease was arbitrary. He pointed out Harvester’s investment in the improvements as the factor making mutual cancellation unacceptable.
Several verbal discussions followed between representatives of the lessor and lessee. Then on April 30, 1975, F. J. Rugg, Harvester’s real estate manager, proposed a cancellation of the lease accompanied by a payment of $69,886 to. Harvester for its building, to be paid when the property was sold. This offer did not ripen into an agreement and things were left unsettled.
On August 27, 1975, Harvester entered into an “operating agreement” with Fine-gold’s corporation, 1601 Poydras Corporation. 1601 obtained possession of the premises for a fixed monthly payment and agreed to indemnify and hold harmless Harvester should Illinois Central attempt to evict and 1601 elect to resist eviction. This written agreement was registered in the Orleans Parish conveyance office.
No later than September 25, 1975, the lessor learned a public parking lot was being operated on its Poydras Street property. Rixon Irvine, in New Orleans on other business, passed the site and noticed the large parking signs prominently displayed on several parts of the premises. On October 29, 1975, Irvine wrote Rugg of Harvester suggesting further discussion of the leases. On November 6, 1975, Rugg responded this way:
“Dear Mr. Irvine:
R. E. Record 761 — New Orleans, Louisiana
R. E. Record 996 — New Orleans. Louisiana
This will acknowledge receipt of your letter dated October 29, 1975, in which you briefly discussed the subject leases and an apparent problem. We’re really not sure a problem exists which would need a solution. It is our viewpoint that we will just continue with the leases and as your records will reveal, we have been paying, and will continue to pay, the rentals due per the terms of the leases.
Inasmuch as we are unaware of any existing problems needing resolution, please feel free to respond if you feel there are *631 any areas which you consider to be a problem.
Very truly yours,
[Signed] F. J. Rugg F. J. Rugg
Real Estate Manager”
In accordance with its assertion in this letter, Harvester continued payment of the rentals and Illinois Central accepted them without any further verbal or written exchanges taking place for approximately 16 months. During this period Irvine, the former negotiator in chief for Illinois Central, was promoted and his replacement as real estate manager was Robert Dobroth. On April 21, 1977, Rugg wrote Dobroth acknowledging he had received a telephone call from Dobroth in mid-March 1977 concerning resolution of “ * * * a problem that may exist on the property we lease from you on Poydras Street * * Again Rugg denied there was a problem. Harvester continued paying the rentals due under the leases and Illinois Central continued accepting the payments. Several more verbal exchanges ensued between the litigants’ representatives and in August 1977 an Illinois Central attorney addressed a compromise offer ir. writing to Harvester’s attorney J. J. Ross permitting mutual cancellation and relieving Harvester of the obligation to remove the improvements. Harvester alerted 1601 of the imminent eviction suit after it rejected this offer.
Having reached no satisfactory conclusion to its off-and-on negotiations with Harvester, Illinois Central filed eviction proceedings in December 1977 and deposited in the registry of court all rents it had accepted for the period beyond November 23, 1977.
The Harvester contract with 1601, alluded to as an operating agreement, is beyond dispute a sublease. 1601 was given occupancy of the premises until 1986 for a fixed monthly rental payable to Harvester. C.C. art. 2674 defines a lease as “a contract by which one of the parties binds himself to grant to the other the enjoyment of a thing during a certain time, for a certain stipulated price which the other binds himself to pay.” Without belaboring the issue we conclude that the sublessee utilized the premises to operate a business totally different from the one operated by Harvester. The leases limited the exclusive use to operation of a retail sales and service truck business and 1601 operates a public parking lot. Applying the rule of interpretation that words are to be understood by their usual signification or popular use (C.C. art. 1946), we hold a public parking lot is not a retail truck sales and service business and is totally dissimilar.
Appellant nonetheless contends it is entitled to be maintained in the premises for either of two reasons: (1) plaintiff, obligated under the lease to approve a sublease that did not damage its property, wrongfully and arbitrarily withheld permission to sublet; or (2) plaintiff’s continued acceptance of rentals for 26 months and failure to initiate eviction proceedings in this period constituted an implied acceptance of the sublease.
Our conclusion that there is merit in the second contention obviates a consideration of the first. Initially Harvester sought written permission to sublease as the written contracts of lease required and within a few days the lessor unequivocally refused. After the principals to these contracts failed to reach a mutually satisfactory termination agreement, Harvester nonetheless began negotiating a sublease with 1601 which it designated as an “Operators Agreement.” Aware of its potential liability in this connection, Harvester incorporated a hold harmless and indemnification clause in it running from 1601 to them. Within approximately one month of the beginning of the parking lot operation, Irvine of Illinois Central learned of the lease. His next contact with Harvester expressed a need to further negotiate the problem between them; Harvester responded immediately that there was no problem and stated “ * * * we will just continue with the leases * * * and will continue to pay the rentals due per the terms of the leases.” Illinois Central said nothing more for 15 months and accepted the rental payments tendered.
*632 Counsel for the lessor suggests the failure to act further is explained by the fact that it had more important things to do. Illinois Central’s real estate division, based in Chicago, has a large staff of legal and lay employees whose duties consist of supervising the ownership of the railroad’s immovable property holdings. The lessor’s planned or inadvertent silence with respect to the operation of the parking lot for 15 months from the time of Harvester’s declared intent to honor the lease and continue the rentals constitutes an implied assent to the terms of the November 1975 letter.
C.C. art. 1811 provides, inter alia, consent to a proposal may be manifested by silence or by other inaction. C.C. art. 1817 further provides:
“Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation; if, after the termination of a lease, the lessee continue in possession, and the lessor be inactive and silent, a complete mutual obligation for continuing the lease, is created by the act of occupancy of the tenant on the one side, and the inaction and silence of the lessor on the other.”
In Moore v. Bannister, 269 So.2d 291 (La.App. 4th Cir. 1972), a sublease to which the lessor never agreed either verbally or in writing was nonetheless upheld as valid when the lessor waited nine months after it became aware of the occupancy of the sub-lessee to protest. The court reasoned:
“The requirement of approval by the lessor in writing contained in the lease is certainly a provision for the benefit of the lessor, and if he chooses to waive it by verbal consent or by his actions, we know of no reason why he could not do so. In previous similar cases we have held that a prohibition against the tenant subleasing unless the lessor yield his consent in writing, is clearly a stipulation in the interest of the lessor alone, and of course he may waive it whenever he pleases to do so; and since there is no law which requires such waiver to be in writing, it follows that the waiver may be oral and need not even be expressed. Moreira v. Heckman, 3 Peltier’s Orleans Appeals # 7842 (La.App.Orls., 1920); Dominique v. Connell, 4 Peltier’s Orleans Appeals # 8051 (La.App.Orls., 1920).
“It appears to us, as it did to the trial judge, that the actions of the plaintiffs in this case were such as to lead us to conclude that the plaintiffs had waived the requirements of approval in writing.” 269 So.2d at 293.
See also Blanchard v. Shrimp Boats of Louisiana, Inc., 305 So.2d 748 (La.App. 4th Cir. 1974). We are aware both Moore and Blanchard are distinguishable in that the lessor never refused to consent to a proposed sublease before the sublease was contracted. However, this distinction does not change the applicability of the principles enunciated to the ease before us.
Had Illinois Central acted to eject Harvester or taken some further action within a reasonable period after receipt of the November 1975 letter to express disapproval, the silent assent could not be implied from the inaction of the lessor. However when it continued to accept rental payments for 26 months after one of its chief executives saw the sublessee in operation, this in itself is sufficient to constitute a waiver of its lease rights quod sublease as well as assent to the terms specified by Harvester in November. See Major v. Hall, 251 So.2d 444 (La.App. 1st Cir. 1971).
For the reasons assigned the judgment appealed from is reversed and plaintiff’s rule for possession is hereby dismissed at its cost.

REVERSED AND RENDERED.

REDMANN, J., concurs with written reasons.
SCHOTT, J., dissents with written reasons.
BOUTALL, J., dissents for reasons assigned by SCHOTT, J.

. Lease # 15730 was extended to November 30, 1986. Parenthetically we note the extension includes “ * * * the right of the Lessor or Lessee to terminate the lease at any time upon giving one year’s notice to the Lessee or Lessor * *

. Expert realtor Omer Kubel assigned this value.