368 So.2d 1009 (1979)
ILLINOIS CENTRAL GULF RAILROAD COMPANY
v.
INTERNATIONAL HARVESTER COMPANY.
No. 62963.
Supreme Court of Louisiana.
March 5, 1979.
Rehearing Denied April 9, 1979.
*1010 Mack E. Barham, Sherry M. Wise, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, Saul Litvinoff, La. State University Law Center, Baton Rouge, for plaintiff-applicant.
Max Nathan, Jr., Peter S.Title, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, for defendant-respondent.
DENNIS, Justice.[*]
In this case we are called upon to decide two principal issues: Did the lessor by its silence and acceptance of rentals under the circumstances of this case impliedly consent to a sublease and a modification of the lease clause restricting the tenant's use and occupation of the premises? Should the court, by applying the doctrine of abuse of rights to the facts of this case, refuse to enforce the lessor's right under the lease contract to withhold permission from the lessee to enter a sublease with a third party?
Illinois Central Gulf Railroad Company (Illinois Central) leased two contiguous parcels of land on Poydras Street in New Orleans to International Harvester Company (Harvester) in 1960 and 1961 for the continued operation of a truck sales and service business which it had established on the same site in 1936. The lease contracts provided that the leases would terminate in 1986. Between 1971 and 1975 the Louisiana Superdome was constructed directly across the street from the leased premises. Consequently, the market value of the property subject to the leases increased in value significantly. Harvester constructed a new building on the leased premises in 1972 but moved its sales and service business from the property in 1974.
On January 17, 1975 Harvester requested Illinois Central's permission to sublease the premises 1601 Poydras Corporation for use as a parking garage. Illinois Central refused and counter-proposed that the leases be cancelled. Harvester once again requested permission to sublease but ultimately offered to cancel the leases for a cash payment. Several months later, on August 27, 1975, Harvester subleased the premises to 1601 Poydras Corporation without notice to Illinois Central.[1] The sublease contract was not recorded until almost nine months after its confection. In September, 1975 Illinois *1011 Central's real estate manager learned that a public parking business was being operated on the premises. In October of 1975 the Illinois Central real estate manager wrote Harvester and, without referring to the parking operation, requested a conference for the purpose of reaching an amicable solution without litigation. Harvester replied by letter within a few days tacitly refusing to confer and stating its intention to continue with the leases. Following this exchange of letters there was no communication between the parties for approximately sixteen months during which Illinois Central continued to accept monthly rent payments from Harvester. In March of 1977 one of Illinois Central's officers complained by telephone to Harvester about a problem existing on the leased premises. Harvester responded by letter on April 21, 1977 that because it had been denied consent to sublease it was continuing to operate under the terms and conditions of the lease.
After further discussions and unsuccessful settlement negotiations Illinois Central filed this eviction suit in December, 1977, and deposited in court all rents received after November 23, 1977. Illinois Central alleged that Harvester had violated the lease contracts by subletting the premises without the lessor's written consent and by using the premises for purposes not authorized by the leases. After trial of the summary proceeding, the district court rendered judgment ordering Harvester to vacate the premises, remove all improvements and deliver possession to Illinois Central. The court of appeal reversed the judgment holding that Illinois Central's silence for sixteen months and acceptance of rental payments for twenty-six months after gaining knowledge of the operation of a parking business on the premises constituted a waiver of its rights under the leases to reject the sublease and to restrict the use of the property. Illinois Central Gulf Railroad Company v. International Harvester Company, 360 So.2d 628 (La.App. 4th Cir. 1978). We granted a writ of certiorari to consider the issues of law raised by the court of appeal opinion.
The leases between Illinois Central and Harvester, in pertinent part, provide:
"It is further agreed by the Lessee, that said premises shall be used and occupied exclusively as a site for [a motor truck sales and service station and warehouse][2] [a storage space].[3]

"* * *
"It is further agreed by the Lessee, not to underlet said premises, or any part thereof, or assign this Lease, without the written consent of the Lessor, first had and obtained."
The contract further provided that, upon the lessee's default in keeping any agreement, the lessor would have the right to terminate the lease.

Implied Consent to Modify Leases
It is uncontroverted that Harvester did not obtain written or express consent before subletting the premises and converting it to a parking garage. The court of appeal, however, found that Illinois Central, by its silence and inaction, had impliedly assented to the sublease and altered use of the premises. The intermediate court's treatment of the issue raises the question of whether a lessor's mere silence in the face of proposals and actions contrary to the lease contract by his lessee constitutes assent to the modification of the contract.
Every contract or modification of a previously concluded agreement requires the concurrence of the consent of the parties. La.C.C. arts. 1766, 1779(2), 1798. Consent results from a free and deliberate exercise of the will of each party where the intent has been mutually communicated or implied, La.C.C. art. 1819, and accepted by the party to whom a proposal is made. La.C.C. arts. 1798, 1800.
Consent may be given either expressly or by implication, La.C.C. arts. 1780, 1811, but the cases in which consent is implied are particularly determined by law. La.C.C. art. 1781. According to the civil code, consent may be implied in the following instances:

*1012 ". . . when it is manifested by actions, even by silence or by inaction, in cases in which they can from the circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent." La.C.C. art. 1811.
"* * *
"[W]hen [actions without words] are done under circumstances that naturally imply a consent to such contract. . . ." La.C.C. art. 1816. See also, La.C.C. art. 1817.
Thus, except in those instances in which the statutory law creates a legal presumption, the mere silence of an offeree should not, in principle, be considered as involving acceptance on his part. His consent can result from silence, however, when combined with other facts or acts so as to imply or indicate his consent unequivocally. 1 Civil Law Translations Aubry & Rau, Obligations, § 343, p. 307 (1965). See, Governor Claiborne Apartments, Inc. v. Attaldo, 256 La. 218, 235 So.2d 574 (1970). In cases where the law does not expressly create a legal presumption of consent from certain facts, it is left to the discretion of the judge to determine if consent is to be implied from the particular circumstances of the case. La.C.C. art. 1818; Pooler Bldg. Mats. Inc. v. Hogan, 244 So.2d 62 (La.App. 1st Cir. 1971).
The civil code and statutes do not provide that any legal presumption of consent shall arise from a lessor's silence and acceptance of rent. Compare, e. g., La.C.C. arts. 2295, 2688-89, 2933, 3145-46. Accordingly, the question to be resolved in this part of the case is essentially factual, i. e., whether the judge exercised sound discretion in determining that Illinois Central's consent to a modification of the lease contract was not unequivocally implied from its silence and inaction under the particular circumstances of the instant case. In his brief dictated reasons for judgment the trial judge found that there had been no showing of consent to the sublease and that Illinois Central's objections and attempts at amicable settlement negated its consent to allow the premises to be used as a parking garage.
We agree with the trial judge's conclusions. There is no showing that Illinois Central unequivocally consented to modify the leases so as to permit a sublease to 1601 Poydras Corporation or to allow the operation of a parking garage on the premises. On the contrary, Illinois Central declined Harvester's proposal for such an amendment of the leases and offered instead to cancel the leases. Harvester's requests for Illinois Central's permission, followed by Harvester's alternative offer to cancel the leases for a cash payment, show that the will of the parties had not united on a modification of the leases. The acceptance of rentals and delay in filing eviction proceedings by the railroad company were not necessarily inconsistent with an intent to enforce the leases as written. Although disputed, there is evidence of record that Illinois Central had no definite knowledge until shortly before filing suit that Harvester had entered a sublease. The fact that Illinois Central, like Harvester, was a large corporation headquartered in Chicago, with extensive national real estate holdings tends to indicate that its delay was due to lack of information and inattention rather than its assent to a modification of the leases. Illinois Central presented testimony from its officers that there was never an intention to accept any modification of the contracts permitting a sublease to 1601 Poydras Corporation or the operation of a parking business on the premises. They attributed the railroad company's lengthy delay and silence to a combination of factors including changes in corporate management, the large number of leases under management, and the desire to avoid litigation. The trial judge apparently found these witnesses to be credible. Considering that he heard and saw the witnesses and that the other circumstances of the case do not unequivocally indicate that the railroad consented to a modification of the leases, we conclude that the trial judge exercised sound discretion in finding that Illinois Central's consent was not to be implied from the evidence of the case.
Harvester has cited a number of decisions in support of its argument that *1013 Illinois Central condoned its violations of the lease contracts by accepting rent for many months after learning of the parking garage operation on the premises. Arms v. Rodriguez, 232 La. 951, 95 So.2d 616 (1957); Canal Realty & Improvement Co. v. Pailet, 217 La. 376, 46 So.2d 303 (1950); Trichel v. Donovan, 138 La. 985, 71 So. 130 (1916); Blanchard v. Shrimp Boats of Louisiana, Inc., 305 So.2d 748 (La.App. 4th Cir. 1974); Moore v. Bannister, 269 So.2d 291 (La.App. 4th Cir. 1972); Major v. Hall, 251 So.2d 444 (La.App. 1st Cir. 1971); Jourdan v. Randall, 190 So.2d 469 (La.App. 1st Cir. 1966). In these cases the appellate courts made factual determinations that the lessor either impliedly consented to a modification of the lease or forgave a breach of the lease. However, a factual determination relating to a party's intention or consent in a particular case, even by an appellate court, does not establish a rule of law for other cases. We interpret the authorities relied upon by Harvester as holdings based on the same legal principles as the instant opinion but reaching different results founded upon different evidentiary records. The appellate opinions in those cases, and the opinion in the instant case, should not be construed as creating legal presumptions of consent beyond those set forth in the civil code or other statutes. It is the function of the legislature to formulate new legal presumptions. The proper role of the court, in cases where statutory legal presumptions are not applicable, is to determine if consent is to be implied from the particular circumstances of the case. La.C.C. arts. 1811, 1818.
Accordingly, we conclude that the court of appeal erred in reversing the trial court's finding of fact with respect to whether the lessor impliedly consented to the sublease or the change in use of the premises.

Abuse of Lessor's Right to Withhold Permission to Sublease
Harvester contends alternatively that, if Illinois Central did not consent to its sublease to 1601 Poydras Corporation, the lessor's exercise of its right to withhold its consent was abusive under the facts of the instant case and therefore should not be enforced judicially.
Article 2725 of the Louisiana Civil Code provides that the lessor may by contract prohibit the lessee from entering a sublease:
"The lessee has the right to underlease, or even to cede his lease to another person, unless this power has been expressly interdicted.
"The interdiction may be for the whole, or for a part; and this clause is always construed strictly."
The article is not clear as to whether a clause expressly interdicting the lessee's right to sublease is to be construed strictly for or against the lessee. However, this Court has said that "[t]he language is taken literally from the Napoleon Code; and the interpretation which it appears to have uniformly received in France . . . is that the prohibition must be construed strictly against the lessee." Cordeviolle v. Redon, 4 La.Ann. 40 (1849).[4]
Harvester points out, however, that the leases in the instant case do not absolutely prohibit subleasing but merely require the prior written consent of the lessor. Consequently, Harvester contends, Illinois Central's refusal of consent should not be judicially enforced if in light of all the circumstances it was an abusive exercise of the lessor's contractual right. See, 2 Colin et Capitant, Droit civil Francais, No. 1041 at 690 (10th ed. 1948); Josserand D.P. 1923.2.172.
This Court expressly recognized the doctrine of abuse of rights in Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La. 1977), and has employed a similar analysis in earlier decisions. Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 *1014 (1919); Onorato v. Maestri, 173 La. 375,137 So. 67 (1931).
Nevertheless, the doctrine of abuse of rights has been invoked sparingly in Louisiana and we must look to other civilian jurisdictions for its full articulation. The doctrine is the product of a French jurisprudential and doctrinal movement which has expanded into most of the civil law jurisdictions "to the point of becoming a widely accepted principle of the Civil Law." Cueto-Rua, Abuse of Rights, 35 La.L.Rev. 965, 967 (1975). See, generally, Catala and Weir, Delict and Torts: A Study in Parallel (Part II), 38 Tul.L.Rev. 221 (1964); Herman, Classical Social Theories and the Doctrine of Abuse of Right, 37 La.L.Rev. 747 (1977); Maynard, Abuse of Rights in France and Quebec, 34 La.L.Rev. 993 (1974); Comment, 7 Tul.L.Rev. 426 (1933). The main body of French case law on abuse of rights is based on article 1382 of the French Civil Code, which is very similar in wording to article 2315 of the Louisiana Civil Code. In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm. See, Cueto-Rua, supra, at 990-91; Catala and Weir, supra, at 222-26. The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. See, Cueto-Rua, supra, at 992-96; Catala and Weir, supra, at 230-34. Protection or enforcement of a right has been denied when the exercise of the right is against moral rules, good faith or elementary fairness. See, Cueto-Rua, supra, at 996-99. Another criteria, espoused originally by the French scholar Louis Josserand, would require an examination of the purpose for which the right was granted. If the holder of the right exercised the right for a purpose other than that for which the right was granted, then he may have abused the right. See, Cueto-Rua, supra, at 1000-1003; Catala and Weir, supra, at 227-29; Herman, supra, at 754-55.
The foregoing principles seem to be the main criteria which have been formulated for applying the abuse of rights doctrine. These tests have met with varying degrees of acceptance in the civil law jurisdictions, and it should be kept in mind that the entire doctrine is in a state of flux. As Professor Cueto-Rua observes:
"* * * The doctrine of abuse of rights is in the making, it is `in fieri.' It is an important juridical-political element of modern civil law doctrine. Although there are still pending important questions concerning its scope as well as criteria for the definition of abusive use of rights, this we may safely say now: it will be difficult for a holder of an individual right, in most of the civil law jurisdictions today, to exercise such right to the detriment of other parties, just for the sheer sake of exercising it. At least a `serious and legitimate interest' will have to be shown in order to justify the exercise of its right."
After evaluating the conduct of the parties in the present case under the jurisprudential and doctrinal tests, we conclude that judicial enforcement of Illinois Central's right to withhold permission for the sublease and change of use proposed by Harvester would not sanction an abuse of right. Illinois Central did not withhold its consent with a predominant intent to harm Harvester. Instead, the record reflects that it refused to grant permission for the purpose of attempting to negotiate a cancellation of the leases with Harvester. The railroad company's motive and intent were openly and honestly stated in its reply to Harvester's sublease proposal:
"Land values have risen so dramatically since the renewal of these leases that we are now receiving an inequitable rental compared to the present day market.
"In view of the existing conditions, rather than approve a sublease, we suggest as an alternative cancellation of both agreements subject to the terms contained in each."
*1015 Since the property involved has greatly appreciated in value, reducing rental revenues to an inadequate level, Illinois Central's withholding of its immediate consent to a sublease for purposes of negotiating a cancellation was certainly based on a serious and legitimate motive.
Moreover, it cannot be said that Illinois Central's refusal to consent to the sublease was adamant or irrevocable; and it does not appear that Harvester was insistent upon its request for permission. Harvester wrote two letters seeking its lessor's consent to the parking lot sublease, but in a third letter it offered to cancel the leases for a cash settlement of $69,886. From these letters it appears that Illinois Central could not have withheld its consent for more than ninety-eight days, and the record reflects that the parties' oral negotiations had shifted from sublease to cancellation much earlier. After this, Harvester never again requested permission to sublease; nor did it seek judicial relief from Illinois Central's alleged abusive conduct. Instead, during the time that its offer to cancel the leases apparently was still open, Harvester entered a sublease with 1601 Poydras Corporation without further notice to its lessor.
We cannot say that Illinois Central exercised its right to withhold consent to a sublease for a purpose other than that for which it was granted. The record is devoid of evidence of the parties' intention in placing the clause in the leases. It cannot be assumed that the lessor merely sought by the clause to protect itself against an objectionable subtenant. The parties likely would have limited the interdiction to subleases with objectionable sublessees if this had been the lessor's only concern. Moreover, in the instant case, the lessee sought to do more than merely substitute an acceptable subtenant for itself; it sought as well to change the use of the premises from a truck retail outlet to a parking garage. Furthermore, Josserand's purpose-of-the-right test has not been generally accepted in the civil law jurisdictions. Cueto-Rua, supra, at 1002-1005; Catala and Weir, supra, at 228.
The exercise of the right to withhold consent was plainly not against moral rules, good faith or elementary fairness. Nor did Illinois Central act without any regard for the interest of Harvester. The railroad company candidly disclosed its motives and intent, bargained in good faith, and offered significant concessions in an attempt to reach a settlement with Harvester.
In summary, we do not find that Illinois Central's conduct falls within any of the definitions of abusive use of rights. The withholding of consent to a sublease was for a relatively brief period of time, not done for the sheer sake of exercising the right, but done for the purpose of attempting to carry on actual good faith negotiations for cancellation of the lease, in which the lessor had a serious and legitimate interest under the circumstances, and the lessee did not pursue its rights vigorously by insisting on a sublease or by proceeding against the lessor judicially before violating the agreements of the lease.

Dissolution of the Leases
Finally, Harvester argues that the trial court abused its discretion by evicting the lessee under the circumstances of the instant case. It relies on Louisiana Civil Code article 2711, which, in pertinent part, provides:
"If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease." Under this article the dissolution of a lease because a tenant has put the premises to a use for which it was not intended requires a showing of loss by the lessor and rests within the discretion of the court. New Orleans and Carrollton R. Co. v. Darms, 39 La.Ann. 766, 2 So. 230 (1887); Stoltz v. McConnell, 202 So.2d 451 (La.App. 4th Cir.), cert. denied, 251 La. 231, 203 So.2d 559 (1967); Arbo v. Jankowski, 39 So.2d 458 (La.App. Orl.Cir.1949). If unauthorized use of the premises were the only basis for dissolution proven in the instant case we might agree that a less drastic remedy would be more appropriate.
*1016 However, the sublease from Harvester to 1601 Poydras Corporation was in violation of clauses contained in the leases expressly prohibiting underletting without the lessor's prior consent. The right to demand a dissolution of the lease is given reciprocally to landlord and tenant if either violates the contract. La.C.C. art. 2729. Unlike the right to dissolve a lease under La.C.C. art. 2711 for use of the premises for an unintended purpose, Article 2729 does not require a showing of actual damage, and our courts have fully enforced the lessor's right to dissolve the lease for subletting the premises in contravention of the contract of lease. Bryan v. French, 20 La. Ann. 366 (1868); Cordeviolle v. Redon, 4 La.Ann. 40 (1849); Reed v. Ross, 12 La.App. 619,126 So. 923 (2d Cir. 1930). Accordingly, we conclude that the trial judge did not abuse his discretion but reached the correct result in dissolving the leases.
For the reasons assigned, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated at the cost of the defendant.
REVERSED: JUDGMENT OF TRIAL COURT REINSTATED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
Under the facts of this case, I consider that Illinois Central impliedly consented to the sublease and change in the use of the premises. Accordingly, I respectfully dissent.
NOTES
[*] Chief Judge William A. Culpepper participated in this decision as Associate Justice Ad Hoc sitting in the place of Chief Justice Sanders, retired.
[1] Under the contract which was designated an "operating agreement," 1601 Poydras Corporation was given possession of the premises in return for a monthly "premium" and its agreement to hold Harvester harmless in the event of eviction. However, Harvester does not contest the finding of both the trial and intermediate appellate courts that the contract was a sublease.
[2] Lease No. 15042.
[3] Lease No. 15730.
[4] See also, Owens v. Oglesby, 123 So.2d 521 (La.App. Orl.Cir.1960); Marcuse v. Shapiro, 1 La.App. 135 (Orl.1924). But see, Gamble v. New Orleans Housing Mart, Inc., 154 So.2d 625 (La.App. 4th Cir.), cert. denied, 244 La. 1027, 156 So.2d 229 (1963); 2 M. Planiol, Civil Law Treatise, No. 1752 (La.St.L.Inst.Transl.1959).