405 So.2d 545 (1981)
ILLINOIS CENTRAL GULF RAILROAD COMPANY
v.
INTERNATIONAL HARVESTER COMPANY
v.
David FINEGOLD, Alvin B. Werner, and 1601 Poydras Corporation.
No. 12606.
Court of Appeal of Louisiana, Fourth Circuit.
September 24, 1981.
Writ Denied December 4, 1981.
*547 Barham & Churchill, Mack E. Barham, Ralph S. Hubbard, III, New Orleans, for appellant Illinois Cent. Gulf R. Co.
Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, New Orleans, for defendant-appellant International Harvester Co.
Nelson, Nelson & Koch, Ltd., Irving H. Koch, New Orleans, for third party defendant and relator David Finegold.
Before GULOTTA, GARRISON and CHEHARDY, JJ.
GULOTTA, Judge.
The dispute in this case centers around the quantum of damages that Illinois Central Gulf Railroad (ICG), lessor, is entitled to receive from International Harvester (Harvester), lessee, because of Harvester's breach of a lease. In an earlier eviction suit, the Louisiana Supreme Court dissolved the lease after concluding that Harvester had violated the lease terms.[1]
In response to ICG's petition for damages for the period of time Harvester occupied the property after ICG's demand to vacate because of the lease violation, Harvester third partied the sub-lessee, 1601 Poydras Corporation, David Finegold and Alvin Werner seeking indemnification from them in accordance with the terms of the sub-lease. In that lease agreement, third party defendants had agreed to hold harmless and indemnify Harvester for any damages resulting from the sub-lessee's failure to surrender the property timely.
A jury verdict resulted in a judgment in favor of ICG and against Harvester in the sum of $73,700.00, with interest from date of judicial demand, and costs, and a further judgment in favor of Harvester and against third party defendants, Poydras Corporation, Finegold and Werner, in solido for the same amount, $73,700.00 with interests and costs. Harvester suspensively appealed. ICG devolutively appealed. Finegold and Werner's appeals were dismissed.[2]
On appeal, Harvester claims the jury verdict is excessive and seeks a reduction to $19,721.00. On the other hand, ICG complains of the inadequacy of the award and *548 seeks an increase to the sum of $340,000.00. We amend the judgment by increasing it from $73,700.00 to $100,000.00.

BACKGROUND
In 1960, ICG leased the subject property (approximately 53,000 square feet of land fronting on Poydras Street, across from the Superdome in the City of New Orleans) to Harvester until 1986 at an annual rental of $9,466.08. The property was to be used as a truck sales and service outlet. In 1975, Harvester subleased the property to 1601 Poydras Corporation for use as a parking lot without ICG's permission which was required under the terms of the lease. Because of this breach, ICG demanded Harvester vacate the premises by December 1, 1977. After the March, 1979 Supreme Court decree dissolving the lease, the sub-lessee vacated the premises and Harvester subsequently demolished improvements that had been placed on the premises in 1972. ICG regained possession of the property clear of the improvements on January 1, 1980. The property was then leased to Downtown Parking Service, Inc. by ICG for operation as a parking lot. On September 30, 1980, ICG sold the site to a third party for $3,076,073.70.

HARVESTER'S APPEAL
In support of its argument that ICG is not entitled to any damages (other than the stipulated rent under the lease for the twenty-five-month period from December 1, 1977 to January 1, 1980), Harvester claims the railroad has sustained no loss from Harvester's sub-lease of the property to the third party defendants. Relying on LSA-C.C. Art. 2711, which provides:
"If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease.
The lessee, in that case, shall be bound to pay the rent, until the thing is again leased out; and the lessee is also liable for all the losses which the owner may have sustained through his misconduct."
Harvester points out that during the occupancy period from December 1, 1977 (the date of demand to vacate) to January 1, 1980 (the date the property was returned to ICG) the leased property increased in value because of inflation and escalation of realty values during that interim period. According to Harvester, the delay in returning the property to ICG enured to the lessor's benefit since it was able to sell the property in September, 1980 for an amount in excess of $3,000,000.00, a price higher than it would have received had it sold the property in 1977 or 1978.
Alternatively, Harvester contends that ICG is entitled to no damages since the lease remained in effect until the judgment of eviction became final in April, 1979. Harvester thus argues that ICG is only entitled to receive rental payments from Harvester in the amount stipulated in the lease until finality of that judgment and for a reasonable period thereafter when the improvements were being removed from the leased premises. Harvester contends ICG is entitled only to the contractual rental for the twenty-five-month period or a sum of $19,721.00. In this connection, Harvester argues further that any legal interest on a judgment in favor of ICG should commence, not from date of judicial demand (December 20, 1977), but only from the date the Supreme Court's judgment in the eviction suit became final (April 9, 1979). Alternatively, Harvester contends ICG is only entitled to legal interest on each monthly installment of rental from the date each installment became due during the twenty-five-month period Harvester occupied the property after ICG's demand to vacate.
We find no merit to these contentions. Assuming that LSA-C.C. Art. 2711 governs entitlement to damages in this case, we are not persuaded by Harvester's contention that ICG has failed to prove a loss, as contemplated under the codal article, for the twenty-five-month period subsequent to December 1, 1977. The earlier Supreme Court decree in the litigation between ICG and Harvester, terminated the *549 lease because of Harvester's contravention of the lease provisions. Between demand for occupancy on December 1, 1977 and the return of the property to ICG on January 1, 1980, plaintiff was entitled to receive a fair market rental for the property. ICG was deprived of the rental proceeds by the wrongful occupancy of the property subsequent to December 1, 1977. It is of no moment that an inflated economy during the interim period resulted in increased value of the property. ICG has established loss and is entitled to recover. We find no error therefore, in the jury's determination of ICG's entitlement to damages.
We also reject Harvester's contention that ICG is only entitled to the contractual rental for the period of Harvester's occupancy subsequent to December 1, 1977. As authority for its position, Harvester cites Reed v. Classified Parking System, 324 So.2d 484 (La.App. 2nd Cir. 1976) where the court held that a lease remains in effect, with a lessee entitled to occupancy and obliged to pay rent, until a court judicially dissolves the lease. Although we do not quarrel with Reed, the mere fact that a lessee is entitled to occupancy and obliged to pay rent until a final judgment of eviction does not mean that the injured party cannot receive damages relating back to the time of breach. As we interpret the cited language in Reed, a lessor cannot resort to self-help to evict a tenant because of his breach; and, conversely, a tenant is not relieved of paying rent simply because the lessor breaches the lease in some manner. Indeed, Reed recognizes that because of a lessor's breach of the contract, a lessee is entitled not only to dissolution of the lease, but to such damages as may have accrued as a result or consequence of the breach. In our case, merely because the lease was not dissolved until April, 1979, when the Supreme Court's opinion in the eviction suit became final, does not mean ICG is limited to damages arising after the finality of that judgment. It is entitled to such damages as may have accrued as a result or consequence of Harvester's breach. Those damages are measurable from December 1, 1977, despite the pendency of the eviction suit until April, 1979. See Wall v. Dudley, 162 La. 952, 111 So. 340 (1927).
Accordingly, we conclude, as apparently the jury did, that Harvester, because of its continued occupancy, is liable in damages measured by the fair rental market value of the premises from the time of ICG's demand to vacate until the time the property was returned to ICG's possession. Further, although the trial judge awarded legal interest from date of judicial demand rather than from the date the Supreme Court judgment became final or when each rental installment became due, we do not find sufficient reason to disturb the amount of interest awarded.

ICG'S APPEAL
The thrust of ICG's appeal is twofold. Supporting its claim that the $73,700.00 award is inadequate, ICG points out that the trial judge erred in permitting third party defendants to participate in the jury trial of the main dispute between ICG and Harvester, after the trial court had granted a summary judgment in favor of Harvester and against the third party defendants, based on the indemnification agreement. According to ICG, although the trial judge refused to permit the jury to become aware of the indemnity agreement, prejudice resulted against ICG because the third party defendants were permitted to cross examine witnesses and to argue before the jury. The railroad reasons that an inclination resulted on the part of the jury to reduce an award in its favor, realizing that the ultimate responsibility for payment of the damage award falls (under indemnification) upon the individual third party defendants and not the corporate entity, International Harvester. ICG further contends the trial judge erred in failing to instruct the jury properly regarding the highest and best rental use in assessing damages and in limiting the period of time for the computation of damages over a twenty-five-month period (from 12-1-77 until 1-1-80) instead of thirty-four months (from 12-1-77 through *550 9-30-80).[3] In support of its position, ICG points out that the only testimony on the highest and best use of the property was elicited from its expert realtor-appraisers who stated that the leased property was most suitable for development as a highrise office building with a fair rental return between 12-1-77 and 9-30-80 of between $10,000.00 and $13,300.00 per month.
Because these contentions are so closely interrelated, we consider them together. We find no merit to ICG's claim that the trial judge erred in his instructions to the jury regarding the proper measure of damages being the "fair market rent it probably could have received had it been able to lease the property to another party." As pointed out by the court in Jackson Brewing Co. v. Wagner, 123 La. 798, 49 So. 529 (1909), a lessee's liability in damages for continued occupancy after the termination of his lease against the protest of the lessor is to be measured by the rental market value of the property. See also, Wall v. Dudley, 162 La. 952, 111 So. 340 (1927). Also see Meyer v. Succession of McClellan, 30 So.2d 788 (La.App.1947), holding that a lessor is entitled to recover actual damages for violation of the lease by the lessee.
ICG's arguments concerning the "highest and best" rental use as the measure of damages must be viewed in light of the relevant rental market. As stated in State, Department of Highways v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir. 1975), "economic rent" in an expropriation case may not be established simply by showing property valuation and determining mathematically the amount of rent an owner must receive in order to reap an acceptable return on his investment. Rather, comparables may be used to show the rental the property could actually produce if put on the lease market. Although the LeBlanc case dealt with a lessee's claim for compensation in an expropriation case, the principle stated therein is applicable in assessing damages in our case for loss of rental value. We therefore find no error in the trial *551 judge's rejection of ICG's proposed instructions.
We reject also ICG's claim that damages should be assessed for a thirty-four month period. Demand was made to vacate by December 1, 1977. The property was returned to the possession of ICG in January, 1980. It was then leased to Downtown Parking Inc. for use as a parking lot until the property was sold in September, 1980. Accordingly, damages were properly determined for the interim period of unlawful occupancy from date to vacate to date of return of possession to ICG.
We likewise reject ICG's claim that the jury erred when it failed to accept the fair market value rental return on the property as testified to by its realtor-appraiser experts, Omer F. Kuebel and Robert W. Merrick. ICG points out that even Harvester's expert stated that a fair rental return during the twenty-five-month period amounted to $100,000.00. ICG therefore argues the jury erred when it returned a verdict in the sum of $73,700.00 when none of the experts testified that this amount was a fair measure of damages.
In addition to the two experts, Kuebel and Merrick, who testified on behalf of ICG, and Max J. Derbes, Jr., who testified on behalf of Harvester, the jury had the benefit of the testimony of Rixon Irvine, ICG's Vice-President, George J. Newton, III, President of Downtown Parking, and David Finegold.
Irvine testified that various parking lot companies had contacted him about possible leases of the property before a lease was negotiated with Downtown Parking in January, 1980. According to Irvine, although it was ICG's intent to sell the property as soon as possession was obtained, as circumstances developed it was leased as a parking lot to produce income. Irvine stated that had a tenant been found who was interested in leasing the property on a long term basis for an apartment building or office complex, ICG would have considered it but could not find anybody who was so interested. As early as 1975, during the pendency of Harvester's lease, Irvine had entertained inquiries concerning sale of the property subject to Harvester's lease, but it was not until February, 1980 that ICG entered negotiations with a buyer that resulted in the signing of a contract for sale of the property in June, 1980. Irvine acknowledged that there was no plan for construction of any highrise building immediately adjacent to the subject property until the fall or winter of 1979, when construction of the Exxon Building next to the subject property became known.
George J. Newton, III contacted ICG in late 1979 concerning leasing of the subject property as a parking lot. Under the lease agreement with ICG, Downtown agreed to pay a fixed monthly rental of $5,833.00 per month and to pay property taxes and 76.5% of the revenue. The lease had a cancellation clause whereby ICG could terminate the lease in the event of a sale to a third party. Downtown began parking operations on January 13, 1980 and made total payments under the lease of $43,212.00 to ICG between January and the end of September, 1980 when the property was sold.
Omer Kuebel testified that the highest and best use of the site producing the maximum benefits of ownership and the highest net income over reasonable period of time was as a highrise office building. Kuebel appraised the market value of the property in the sum of $1,500,000.00 in December, 1977 based on the market data approach of studying comparable sales. He testified that a reasonable net return on the property as part of a long-term lease was 8% per annum or a monthly return of $10,000.00. Kuebel estimated that ICG would have been able to find a long-term tenant within thirty days after December 1, 1977 and would have received a $10,000.00 per month rental within six months. On cross examination, Kuebel acknowledged that much vacant land in the central business district was being used for parking purposes. According to Kuebel, interim rental of the property as a parking lot would bring the property owner about 60% of the parking *552 lot operator's projected gross income of $81,000.00 per year.[4]
Robert W. Merrick also testified that the highest and best use of the subject property was as a highrise office building. He appraised the property as of December 1, 1977 at $1,700,000.00 and estimated a fair rental of the property at its highest and best use to be 8% of this value or $11,333.00 per month, totaling $283,325.00 as a fair rental for the 25-month period. According to Merrick, use of the property as a parking lot was only an "interim" use until an office building development was constructed on the site.
Max J. Derbes, Jr. testified, on the other hand, that the site was not suitable for rental as an office building in 1977-1979. Although he agreed with Kuebel's appraisal of $1,500,000.00 as the value of the property in December, 1977 and felt its highest and best use would be as a highrise office, Derbes was of the opinion that the highest and best use for the 25-month period was an interim use as a parking lot. According to Derbes, it was not until the Exxon Building was planned on the site next to the subject property that the area became "ripe" for office building development in late 1979. He estimated that ICG could have received $50,000.00 per year for lease of the subject property as a parking lot from December 1, 1977. Total damage to the railroad, according to Derbes, was therefore $100,000.00 for the 25-month period.[5]
The final witness was David Finegold, president of 1601 Poydras Corporation, the third party defendant who had operated the parking lot under a sublease with Harvester before vacating the premises in April, 1979. The minimum monthly rental agreed upon was $2,661.88. Finegold related that the site had 100 parking spaces when he operated it.[6] He stated that it was difficult to realize a profit on the site as a parking lot and that on two occasions International Harvester reduced his rental below the stated minimum monthly sum.
Having reviewed the evidence, we are at a loss to reconcile the jury's verdict of $73,700.00 with the testimony concerning rental value of the property. The amount of the verdict does not correspond to the rental values of the property as set forth in the testimony.[7] Nevertheless, it is obvious that the jury rejected the testimony of plaintiff's experts and relied instead on the determination of the fair rental value of the property based on its use as a parking lot. Considering the testimony of defendant's expert, Derbes, that rental of the site was best suitable for use as a parking lot during the 25-month period, we cannot say that rejection of the higher values based on the use of the property as a highrise office building as claimed by ICG's experts was erroneous. This is a credibility finding and we do not disturb that determination.
On the other hand, it appears that the jury was influenced by Finegold's testimony to temper its verdict and award a lesser amount. Harvester's expert, Derbes, clearly testified that fair rental value of the property for the 25-month period under *553 lease as a parking lot was $100,000.00. A reasonable conclusion under the circumstances is that the jury was influenced by Finegold's testimony concerning financial difficulty in operating the lot together with realization that Finegold would ultimately bear the responsibility for satisfaction of the judgment.
In this connection, we do find merit to ICG's claim that the trial judge erred in permitting the third party defendants to participate in the trial of the dispute between ICG and Harvester. Once having determined that Harvester was entitled to a summary judgment against the third party defendants based on the indemnification, it was an abuse of the trial court's discretion[8] to permit participation by these third party defendants in the trial of the main dispute between ICG and Harvester. Because we conclude prejudicial error as a matter of law resulted in an award not responsive to the testimony and evaluations of the experts but at the same time find no basis for disturbing the more probable than not credibility determination of the jury, we increase the award from $73,700.00 to $100,000.00.
Accordingly, the judgment in favor of Illinois Central Gulf Railroad and against International Harvester Company in the sum of $73,700.00 is amended and increased to $100,000.00. The judgment in favor of International Harvester Company and against third party defendants David Finegold, Alvin B. Werner and 1601 Poydras Corporation, in solido, is amended and increased from $73,700.00 to $100,000.00. In all other respects the judgment is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] Illinois Cent. R. Co. v. International Harvester, 368 So.2d 1009 (La.1979).
[2] This matter is before us on an expedited appeal. While the suspensive appeal was pending, Harvester sought to execute the judgment in its favor against the third party defendant Finegold. Finegold then applied to this court for supervisory writs seeking to stay the execution of the judgment by Harvester on the ground that execution was premature in that ICG's judgment against Harvester was not final and could be reversed on appeal. Because of the obvious problems that might result if execution had been permitted, we granted an expedited appeal and stayed International Harvester's execution against Finegold pending disposition of the appeal.
[3] The trial judge instructed the jury as follows:

"Illinois Central Gulf Railroad was entitled to possession of the premises in question on December 1, 1977. It did not actually obtain possession until January 1, 1980, some 25 months later. The railroad is entitled to any damages it may have sustained as a result of this twenty-five month delay in regaining possession. In this case the damages would be the fair market rent it probably could have received had it been able to lease the property to another party. It is for you to determine from all the evidence the total fair market rent for this property during the twenty-five months in question."
ICG's requested charge No. 16A, which was rejected by the trial court, reads as follows:
"I instruct you that the damages due to Illinois Central Gulf Railroad Company from International Harvester Company are from December 1, 1977 until Illinois Central Gulf Railroad Company ceased to suffer damages because of the wrongful occupation of the premises.
Illinois Central Gulf Railroad Company contends that from January 1, 1980 through September 30, 1980 it took possession of the property and tried to mitigate its damages.
Louisiana law requires a party to mitigate or minimize its damages. To the extent the party is required to make its best efforts to mitigate you may examine that attempt to see if sufficient effort was expended. You are to decide when Illinois Central Gulf Railroad Company was restored to possession of the property. If you decide it was restored to possession January 1, 1980 because they had control of the property after that date but that it was still suffering damages you must require them to exercise that control so as to minimize those damages.
You must deduct from any damages suffered after physical return of the property any sums Illinois Central Gulf Railroad Company receives through mitigating its damages. You are to determine the period of time for which damages should be paid after December 1, 1977 and the amount of these damages."
ICG's requested charge No. 20 (also rejected by the trial judge) reads as follows:
"Illinois Central Gulf Railroad Company is entitled to receive damages based on income it could have received from the property based on the highest and best use to which the property could be put at its market value. Highest and best use is defined as the most favorable use to which the property is adaptable. It is the use which provides the greatest benefits of ownership; that legal use which given a reasonable period of time is anticipated to produce the greatest net return to the land. The market value of the property is the price which would be agreed upon at a voluntary sale between an owner willing to sell and the purchaser willing to buy. The preferred yardstick in the determination of the value of property is evidence of sale of similar or comparable properties in the vicinity."
[4] 60% of $81,000.00 is $48,600.00 per year, or $4,500.00 per month rental income under a lease as a parking lot. For the 25-month period from December 1, 1977 to January 1, 1980, the owner would therefore receive $112,500.00 as rental income.
[5] Derbes testified that it would take about 1 month to surface the site for use as a parking lot. Hence, the rental for the 25-month period would be $100,000.00 based on a $50,000.00 annual rental.
[6] When Finegold operated the parking lot under his agreement with Harvester, the buildings were still on the property. After the buildings were demolished and the property was returned to ICG, the new parking tenant, Downtown, was able to park a greater number of cars.
[7] A reasonable rental for the 25-month period according to plaintiff's experts ranged from $250,000.00 to $283,325.00. Rental of the site for 25 months at $5,833.00 per month (rental paid by Downtown Parking under its lease with ICG) would amount to $135,725.00. Rental for 25 months at $2,661.88 per month (amount paid by Finegold under his sublease with Harvester) would amount to $66,547.00. None of these figures corresponds to the jury verdict of $73,700.00.
[8] See LSA-C.C.P. Art. 1038; Offshore Crewboats, Inc. v. Harredge, 306 So.2d 774 (La.App. 4th Cir. 1975), writ denied, 310 So.2d 641 (La. 1975); Whitener v. Clark, 356 So.2d 1094 (La. App. 2d Cir. 1978), writ denied 358 So.2d 638, 641 (La.1978).