404 So.2d 999 (1981)
Ross E. COX
v.
Claude KIRKPATRICK, et al.
Ross E. COX
v.
SOUTHERN COLONIAL INVESTMENT, INC., et al.
Nos. 14254, 14255.
Court of Appeal of Louisiana, First Circuit.
August 24, 1981.
Rehearing Denied October 10, 1981.
Eric A. Kracht, W. P. Wray, Jr., Bert K. Robinsin, Baton Rouge, for appellee.
Thomas K. Kirkpatrick and James B. Thompson, III, Baton Rouge, for appellants.
Before COVINGTON, CHIASSON and LEAR, JJ.
LEAR, Judge.
These two consolidated suits were filed by Ross E. Cox (plaintiff)[*] against Claude Kirkpatrick, Wayne D. Swenson, Sr. and Southern Colonial Investment, Inc. (defendants).
In the first ["paving"] suit, (Appeal Number 14,254), plaintiff sought recovery of an amount for paving work which plaintiff had performed on properties owned by defendants in the Interstate Shopping Center. Defendants filed a reconventional demand, alleging that plaintiff breached his agreement with defendants, whereby defendants were given the "right to earn" commissions upon obtaining leases on property owned by *1000 plaintiff. Defendants claim damage in the amount of $100,000.00.
In the second ["lease"] suit, (Appeal Number 14,255), plaintiff sought recovery of unpaid rental installments on a lease to defendants of property owned by plaintiff in the Colonial Shopping Center in the total sum of $75,000.00. Defendants in this suit also filed a reconventional demand, in which they sought cancellation of the lease sued upon by plaintiff, or a reduction of the amount owed, on the grounds that plaintiff had arbitrarily and capriciously denied defendants permission to sub-lease the premises in violation of the terms of the lease.
Defendants' reconventional demand in the first suit, and the lease sued upon by plaintiff and defendants' reconventional demand in the second suit are related to an exchange whereby plaintiff transferred Highland South Shopping Center to defendants in exchange for Colonial Shopping Center.
After a consolidated trial of these suits, plaintiff obtained judgment against defendants in the "paving" suit in the amount of $12,666.64, and in the "lease" suit in the amount of $52,500.00 subject to a credit to defendants of $6,358.32. Defendants' reconventional demands in both suits were dismissed with prejudice. Defendants then appealed both judgments.
Although consolidated for trial and on appeal, in order to avoid confusion, each suit is addressed separately.
The trial court, in a lengthy and well reasoned opinion, which we adopt in part, held as follows:

IN RE: APPEAL NO. 14,254
"The parties have stipulated that plaintiff furnished defendants paving for their Interstate Shopping Center in the amount of $21,666.64 (sic) [the correct amount is $12,666.64] for which defendants have not paid; the defense is that plaintiff agreed to permit defendants to earn real estate commissions by leasing for plaintiff a 12,000 square foot tract in Colonial Shopping Center, that defendants obtained and presented to plaintiff the lease prospects, but plaintiff failed to proceed in good faith to execute the leases.
"Accepting defendants' own testimony, they had an understanding with plaintiff under the terms of which plaintiff would afford them the `right to earn' commissions totalling between $70,000 and $132,000. At first blush, a contract which has as its object the obligee's `right to earn' money by obtaining leases acceptable to the obligor appears to be no contract at all. However, such a contract may constitute an innominate contract, as provided by CC Art. 1787 (sic) [CC art. 1777-78]. Assuming such an agreement could constitute the object of a contract, no contract was formed between these parties because there apparently was no certainty as to the amount which the defendants would have the right to earn. The testimony as to the total sum varied; the variance may be ascribed in part to the allowance for the $60,000 in paving which plaintiff subsequently gave defendants but, even allowing for this, there is uncertainty as to the precise amount which defendants would have the right to earn. For example, the petition sets forth the sum of $100,000, which bears no reasonable relationship to the sums of $70,000 and $130,000, allowing for the circumstance of the deduction of the $60,000 in paving. Under these circumstances, the court is of the opinion that there has been no meeting of the minds and thus no contract.
"Assuming that defendants' evidence had established the amount which they had the right to earn with sufficient specificity to reflect to (sic) meeting of the minds, they have failed to meet their burden of proving, by a preponderance of the evidence, the existence of an innominate contract under the terms of which they received the right to earn commissions somewhere between $70,000 and $132,000.
"The testimony of defendants Kirkpatrick and Swenson is sometimes confusing as to when and how this contract arose, and the amount thereof. Plaintiff denies the contract's existence, and his denial is supported by three denials by defendants. The first denial occurred at the `dry run' a few *1001 days before the closing of the exchange on June 23, 1972. The second denial occurred at the closing. The third denial occurred on or about September 21, 1972 .... Additionally, defendants admitted that they did not talk personally to Cox about the matter. Apparently, if they received any representations about plaintiff's amenability to binding himself to giving them the `right to earn' commissions, it came through one Wicker, whom, under the circumstances, they could not reasonably have believed to be the agent of plaintiff.
"Another circumstance pointing away from any binding agreement is that the consideration for that agreement would have been, by defendants' contentions, an imbalance, in plaintiff's favor, in the values of the properties exchanged; however, defendants leased other property from plaintiff the lease in suit No. 169,896 [Appeal No. 14,255]to make up an imbalance, in their favor, in the same exchange.
"The court is troubled by the letter proposal of June 1, 1973 ....[[*]] This lends some force to defendants' argument that there was an agreement under the terms of which they were entitled to earn a commission for the leasing of plaintiff's properties. The force of this evidence is weakened, however, by the terms of the proposal, under which defendants were to do much moreand obligate themselves much moreand if they merely were to `broker' leases for plaintiff.
"Even more telling is the way in which the defendants in their personal testimony characterized their arrangement with Cox on the `right to earn' issue. They described it as a `gentlemen's agreement', and a `general understanding', and testified that it was `nothing that was legally binding.'[[1]]
"Considering all of the evidence, the defendants have failed to meet the burden of proof that there was in fact a valid and enforceable contract under the terms of which they had the `right to earn' certain moneys.
"There is still another reason why defendants cannot prevail on their claim of a contract giving them the right to earn $70,000, or $132,000, or some amount in between, by obtaining tenants for plaintiff's 12,000 square foot tract in Colonial Shopping Center. Defendants are not licensed as real estate brokers. At the time of the events in question in this lawsuit, R.S. 37:1450 provided that:
"`No person, not licensed in accordance with the provisions of this Chapter, shall recover any fee, claim or charge for brokerage in the courts of this stage (sic).'
and R.S. 37:1437 provided that
"`No person shall engage in the business or capacity, either directly or indirectly, of a real estate broker ... unless he has a license under the provisions of this Chapter.'
R.S. 37:1431 defined a `real estate broker' as `any person who, for ... valuable consideration... leases or offers to lease ... any real estate ... for others, as a vocation.'
"The argument that this was not defendants' primary occupation, and thus they would not attempt to lease plaintiff's property `as a vocation', is dispelled by the decision in Maniscalco v. Glass [La.App.], 163 So.2d 438 (2d Cir. 1964).
"Thus plaintiffs are barred by statute from performing the obligation which they admittedly were required to perform before they could recover anything under the alleged contract. The exception of no cause of action filed by the plaintiff to defendants' reconventional demand in this suit has *1002 merit, and should be sustained. Since it was filed during the trial and is being disposed of at the same time as the decision on the merits, the effect is merely that defendants, as plaintiffs in reconvention, have failed to establish that a valid contract giving them the `right to earn' commissions ever came into existence."

IN RE; APPEAL NO. 14,255
"Plaintiff leased [to] defendants certain property in Colonial Shopping Center for a period of sixty months, at a monthly rental of $1,250. Defendants executed the lease as an inducement to plaintiff to enter into the Highland South-Colonial exchange; apparently the basic notion was that defendants possibly would sublet the property, perhaps for a higher rental, and would either make a profit, or at least be relieved of their lease obligations, thereby, but if they failed to do so they would nevertheless be liable to plaintiff for the basic rental. Defendants made 18 of the payments, but the remaining installments, totalling $52,500.00, admittedly are accrued and unpaid. Plaintiff must prevail unless defendants can establish a defense; they have attempted to do so by alleging that plaintiff's refusal to accept sublessees tendered by them was arbitrary and capricious, and that plaintiff's breach of the lease relieved them of the obligation to make further payments.
"Defendants introduced evidence tending to prove that several prospective tenants were submitted to plaintiff, but that he refused to approve leases to them. Plaintiff's contention is that none of the proposed leases were acceptable because the proffered sublessees did not met the qualifications imposed in the lease between plaintiff and defendants. The lease contains a large number of these conditions or qualifications, and the evidence establishes that many of them were not satisfied by defendants and the subleases which they allegedly tendered. For example, the right to sublease was contingent upon defendants' having paid `all rent punctually'; defendants rarely paid the rental on the due date. The subleases were to be `net-net-net' leases, with all benefits payable to the plaintiff, and to be limited to ten years. In addition, the tenant was required to have ten years' business experience and credit approved in advance by Fidelity National Bank. The two subleases about which extensive testimony was submittedDansky and International Property Managementeach failed to qualify on a number of these requirements.
"Defendants' response to this is that plaintiff failed to perform his obligation to accept sublessees tendered by defendants in good faith, and that his action in refusing these subleases was arbitrary and capricious. Defendants thus are invoking the `good faith' doctrine of CC Art. 1901, and the `abuse of right' doctrine.
"However, we do not believe that those doctrines apply where, as here, the tenants lease the property as an inducement to the lessor to purchase (here, through exchange) the leased premises from the tenants. The tenants apparently were willing to `lease back' the property as a consideration for the lessor's purchase, and the lessor then was willing to agree that if certain stringent requirements were met, he would permit them to substitute others under the lease. Plaintiff negotiated these terms at arms' length as part of the consideration for a multi-million dollar purchase [exchange], and he should have the right to insist upon them.
"Even if a lessor could be held to be in `bad faith' or to have `abused his rights' in insisting upon specific sublease provisions for which he bargained at arms' length, the court is of the opinion that in this case plaintiff's rejection of the proffered sublessees was based upon sound investment and rental property management principles, and is neither in bad faith nor an abuse of rights.[[2]]
*1003 "Defendants' other contention is that the lease afforded plaintiff the option, at his whim, to accept or reject subleases, and thus was subject to a potestative condition. This argument overlooks the fact that defendants received, in addition to the sublease provision, other consideration, much more valuable to them, for the execution of the leaseplaintiff's agreement to enter into the exchange of the Highland South Shopping Center for the Colonial Shopping Center (see, e. g., Par. IX of the lease, Cox 1). Assuming the sublease provision was potestative, it does not nullify the contract where, as here, there was other consideration sufficient to support the agreement. Since plaintiff has made out a prima facie case and defendants have offered no other defense, judgment should be rendered in favor of plaintiff ..., subject to any credits to which defendants are entitled. There is one such credit.
"Prior to the expiration of the lease, and while defendants were in default, plaintiff re-let the premises to one McClement. Defendants are entitled to a credit for the rental received by defendant (sic) on the new lease; the only issue is the amount of such credit. Under the initial lease with defendants, plaintiff was obligated to make $30,000 in improvements; under the McClement lease, the tenant was obligated to make the improvements. However, plaintiff made the improvements, and the tenant is repaying him with monthly payments of $334.37 per month. Under these circumstances, plaintiff as a practical matter is in the same position with the new tenant McClementas he would have been under the lease in suit if he had made the improvements and the defendants had paid him $516.24 ($181.87 rental payments plus $334.37 payments on the construction loan) per month. Under these circumstances, defendants are entitled to that credit. The McClement lease took effect on January 1, 1975, and ran through the expiration of defendants' lease, and encompassed the final 29.7 months of defendants' lease. Thus defendants are entitled to a credit of 29.7 times $516.24, or a total of $15,332.33 [minus proper deductions in the amounts of $8,224.01, being a 9½% return on the $36,112.20 investment made by plaintiff and the amount of $750.00 as the real estate commission paid by plaintiff to procure the substitute lease, for a total credit to defendants in the amount of $6,358.32.]"
For the above reasons, the judgments of the trial court in both suits (Appeal No. 14,254 and Appeal No. 14,255) are affirmed. Defendants-appellants are to pay all costs.
IN APPEAL NO. 14,254: AFFIRMED.
IN APPEAL NO. 14,255: AFFIRMED.
 APPENDIX A
 June 1, 1973
Mr. Ross E. Cox
P. O. Box 15467
Baton Rouge, Louisiana 70815
 In re:
 I. The unfinished portion of existing
 buildingColonial Shopping Center
 Lot 12 of Southern Colonial
 Park Subdivision, East Baton Rouge
 Parish, La., referred to herein as
 Area "A"
*1004
 II. Proposed 12,000 square foot building
 Lot 11 and/or 12 Southern Colonial
 Park Subdivision, East Baton
 Rouge Parish, La., referred to herein
 as Area "B"
Dear Mr. Cox:
We propose to render such services as is necessary for leasing of the premises referred to as Area "A" and Area "B" in the caption, including completion of construction of Area "A" and construction of proposed building on Area "B", and to secure lessees therefor, all in accordance with and subject to the terms, conditions and provisions appearing hereinafter and all of which shall be performed by us at our sole cost and expense, without right of reimbursement from you, except to the extent specified hereinafter.
Attached hereto is a drawing showing Area "A" and Area "B". We have signed and dated the attached drawing for identification with this letter proposal.
Area "A" is presently leased to Southern Colonial Investment, Incorporated. We are the stockholders of Southern Colonial Investment, Incorporated and guarantors of the lease between you and Southern Colonial Investment, Incorporated with respect to Area "A" which lease is dated June 23, 1972. The proposals made herein shall not affect the obligations of Southern Colonial Investment, Incorporated or our obligations to you as guarantors of Southern Colonial Investment, Incorporated except to the extent as is specified herein and then only to the limited extent as is specified in these proposals. We further acknowledge that the lease dated June 23, 1972, is but one of several agreements made between Southern Colonial Investment Incorporated, you and us, all dated June 23, 1972, and that these proposals shall not in anywise modify, change, alter or in any respect affect the obligations of any of the parties to the agreements dated June 23, 1972, and that such agreements shall continue in full force and effect.
We propose to secure a written lease for you as Lessor with Western Auto Supply Company as Lessee for not less than 9,000 square feet of building area proposed to be located in Area "B". The lease shall provide for a term not less than fifteen (15) years and shall comply with the requirements specified herein for the leases which we propose to secure for you. We propose to lease the balance of the proposed 12,000 square foot building area, namely 3,000 square feet to other tenants in accordance with the requirements set forth hereinafter for leases.
We further propose to secure leases for you for the unfinished portion of the existing buildings on Colonial Shopping Center referred to as Area "A" and to secure said leases in accordance with the requirements set forth hereinafter for leasing.
All leases proposed to be secured by us for you shall comply with the following requirements:
1. All leases shall be in writing.
2. All leases shall be for a term of not less than five (5) years nor more than ten (10) years, except the lease with Western Auto Supply Company which shall be for a term not less than fifteen (15) years.
3. All rentals, sums and amounts and all economic benefits arising therefrom shall be payable to you as lessor and no part or portion thereof shall be payable or may be payable to us or to anyone else.
4. Minimum rentals shall be for $2.75 per square foot and the total rental of all square footage involved in Area "A" and Area "B" shall be so calculated as to produce a sum sufficient to fully amortize the loan for improvements specified hereinafter, and in addition thereto a sum equal to the taxes, insurance and maintenance plus a sum not less than $15,000.00 per year.
5. All leases shall specify net rental to you which for the purposes of these leases shall mean that the rentals shall be net to you after payment of taxes, insurance and all costs of repairs and expenses involved in maintenance.
*1005 All leases and all lessees shall be subject to your approval and shall be made in your name as lessor and shall require your signature thereto as lessor.
We propose to prepare plans and specifications for the completion of the unfinished portion of the existing building referred to as Area "A" and to prepare plans and specifications for the construction and erection of the 12,000 square foot building proposed to be constructed and erected on Area "B" and to have such plans and specifications prepared at our sole cost and expense and submitted to you for your approval. We further propose to complete the construction of the unfinished portion of the existing buildings referred to as Area "A" and to completely construct and erect the proposed 12,000 square foot building on Area "B" in accordance with plans and specifications to be prepared by us at our sole cost and expense and to be approved by you. We propose that all construction in Area "A" and Area "B" shall be of the best quality of materials and in a thoroughly workmanlike manner and to furnish you with payment and performance bonds in connection therewith pursuant to construction contracts to be entered into by us with you, all of which shall have your approval prior to any work being done or performed in connection therewith. We shall provide you with public liability, property damage and workman's compensation insurance in amounts and companies satisfactory to you. We warrant that the total sum to be extended by you in accordance herewith as to Areas "A" and "B" shall not exceed the sum of $200,000.00 to be applied in the following sums and amount as to Area "A" and Area "B":

1. Completion of construction of
 Area "A" $ 30,000.00
2. Completion of construction of
 12,000 square foot building on
 Area "A" 146,000.00
3. Payment for the lease of 12,000
 square feet in Area "B" from
 your existing mortgage 24,000.00
 ___________
 $200,000.00

We propose further to secure for you and in your name a loan for the total sum of cost of construction and completion of construction in Area "A" and Area "B" including the cost of release from your first mortgage, namely the total sum of $200,000.00, the terms of which the loan shall be amortized over a period of twenty (20) years at a rate of interest not to exceed eight and one half (8½) percent per annum. The said loan shall provide repayment in level monthly installments over said twenty (20) year period provided however that said loan shall be evidenced by such documents as is necessary to reflect that you shall not be responsible for the payment of said loan and that the property designated herein as Area "B", together with its improvements shall stand solely responsible for the debt and that there shall be no personal liability on your part as maker of such evidence of the indebtedness.
Under no circumstances shall you be required to pay us for any sum in addition to or in excess of the actual cost to us of construction or completion of construction for the work to be performed in accordance herewith to Area "A" and Area "B".
For and in consideration of the services to be rendered by us proposed to be performed herein, all of which shall be performed at no cost or expense to you and without reimbursement from you, we shall be entitled to receive from you, over a period of seven (7) years and six (6) months from the date hereof all sums received by you from rentals under leases on Area "A" and Area "B" in excess of the total sum sufficient to amortize the loans for the improvements, the total of taxes, insurance and costs of repairs and expenses involved in maintenance together with the sum of $15,000.00 per year. On termination of seven(7) years and six (6) months from the date of this letter, we shall not be entitled to receive any sum or sums whatsoever in connection with the rental to be received by you thereafter from leases of the areas referred to herein as Area "A" and Area "B".
We further herewith agree that we shall hold you harmless and keep you indemnified from all other fees, costs or expenses, commissions or finder's fees in connection *1006 with the leasing and/or completion of construction of the improvements on Area "A" and Area "B" as referred to herein and including all costs, expenses and attorney's fees.
We further propose that upon our full and complete compliance with the terms and conditions of this letter agreement and upon completion of construction of the premises in Area "A" and Area "B" and upon occupancy of said premises by tenants sufficient to afford you rentals to be received by you in excess of the amortization of the loans, taxes, insurance and expenses of maintenance, so that you will be receiving $15,000.00 above the total of those items, you and Southern Colonial Investment, Incorporated and we, as guarantors shall continue to make said rental payments due under said lease of June 23, 1972, until you are in possession of leases with Western Auto Supply Company and others sufficient to produce the sum of $15,00.00 per annum in excess of the costs and expenses specified herein in accordance with terms and conditions hereof.
We herewith agree that nothing whatsoever contained herein shall permit or allow us to negotiate for you as your agent or bind you as your agent in the course of negotiations and all of our negotiations, activities and the performance of our obligations hereunder shall be as independent contractors rendering independent services and that we shall not hold ourselves out as your agent, or in any way subject you to responsibility for our activities. All of the services to be rendered by us under the terms and conditions hereof shall be subject to your approval and you shall not be responsible for any sum or sums whatsoever unless the same has been approved by you prior to the expenditure thereof in writing or prior to the incurrence of any indebtedness, claim or action, all to be approved in writing prior to the same.
We further agree that the use and occupancy of Area "A" and Area "B" shall never be in conflict with any other tenant or lessee of Colonial Shopping Center or shall the use or occupancy of Area "A" or Area "B" be objectional to any of the tenants or lessee of Lot 11 or Lot 12 of Southern Colonial Park Subdivision and that the use of said premises shall be compatible with all other tenants of said Lots 11 and 12 of Southern Colonial Park Subdivision.
We have provided a place for your signature at the foot of this letter and will, upon receipt of a copy hereof signed by you proceed to immediately produce and secure for you the lease with Western Auto Supply Company. We agree that this agreement shall be null and void and of no effect whatsoever in the event we do not secure and produce for you the lease with Western Auto Supply Company in accordance with the terms and conditions of these proposals.
 Yours very truly,
 /s/ Wayne D. Swenson
 Wayne D. Swenson
 /s/ Claude Kirkpatrick
 Claude Kirkpatrick
NOTES
[*] On August 1, 1981, and after preparation of this opinion, Ross E. Cox died, and Billie Maier Cox was thereafter confirmed as executrix of the succession of Ross E. Cox and on her motion has been substituted for Ross E. Cox in this court.
[*] This letter is attached as Appendix A.
[1] The court has not overlooked the fact that defendants spent a considerable amount of time attempting to negotiate a lease between Western Auto and plaintiff on the 12,000 square foot tract in Colonial. If they had been successful, they may have been entitled to a fee. This, however, does not support their contention here madethat they had acquired the indefeasible right to earn commissions from the lease of plaintiff's property, either from the Western Auto lease or from some subsequent lease. Since the court finds that no such right was acquired, and since the Western Auto contract was not confected, defendants are not entitled to a credit or judgment as a result of such contentions.
[2] Defendants' major contention is that plaintiff failed to properly evaluate the subleases which were proffered, "dragging his feet" and arbitrarily refusing to approve satisfactory leases. The evidence does not support this contention, however. Defendants' evidence, as well as plaintiff's, establishes that the subleases when tendered did not contain plans and specifications from which plaintiff could determine the cost of making the premises suitable for occupancy by the tenant. At least one of the tenants did not possess a credit rating justifying a lessor's investment in the costs of readying the premises for occupancy. While plaintiff may not have taken the initiative in obtaining suitable subleases, such was not his burden. Plaintiff was an investor and defendants were in the business of leasing properties. In view of their respective expertise and their relative positions (plaintiff had a lease and had merely given defendants a chance to pass the rental on to third persons), defendants, and not plaintiff, should have born[e] the burden of presenting subleases which were technically correct and which met either the express provisions of the lease, or sound investment principles, or both. Defendants did neither, however. Apparently they turned the subleasing problem over to real estate agents, without informing those agents of the requirements for subleases set forth in the lease between plaintiff and defendants. The court is of the opinion that defendants simply did not take care of the business of subleasing, although it was their obligation and they would have reaped the profits therefrom.