**William M. CLARK, Jr.**

v.

**GLIDDEN COATINGS & RESINS, a DIVISION OF and the SCM CORPORATION.**

Civ. A. No. 84–1266.

United States District Court, E.D. Louisiana.

Feb. 10, 1987.

Theodore A. Mars, Jr., William Tete, Mars, Medo & Tete, H. Sloan McCloskey, Baldwin & Haspel, New Orleans, La., for plaintiff.

John C. Reynolds, Lemle, Kelleher, Kohlmeyer, Hunley, Moss & Frilot, New Orleans, La., Richard Z. Jambor, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION

MENTZ, District Judge.

### JURISDICTION

This is an action for a state law remedy brought pursuant to 28 U.S.C. § 1332 on the basis of complete diversity of citizenship between plaintiff and defendant and an amount in controversy exceeding $10,000. Diversity jurisdiction is established.

This suit arises out of the employment relationship between the plaintiff, William

Clark, and the defendant, Glidden Coatings and Resins, a division of and the SCM Corporation (Glidden). Mr. Clark filed suit seeking wages and benefits allegedly owed him due to underpayments during a portion of his tenure at Glidden. Specifically, it was alleged that Clark was owed past wages for fiscal year (FY) 1977 through FY 1984; and consequently he was entitled to a recalculation of his stock bonuses, retirement benefits, and other fringe benefits. Prior to trial in this matter, in a Memorandum Opinion of August 30, 1985, the Court ruled that the plaintiff's claim for past due wages had prescribed for the period prior to March 14, 1981.

The Court, after considering the evidence, the applicable law, and memoranda submitted by counsel, now makes the following findings of fact and conclusions of law. To the extent that any findings of fact are conclusions of law, they are adopted as such; to the extent that any conclusions of law are findings of fact, they are so adopted.

## FINDINGS OF FACT

### I.

Mr. Clark started work for the defendant, Glidden, in October of 1949. His initial position involved laboratory work, which necessitated no sales related activity. In 1957, plaintiff began an involvement with Glidden's marine sales, but still worked in the lab and surveyed products of competitors. Mr. Clark assisted in the development of unique coatings for offshore marine use, and was an instrumental force in the development of the offshore marine market for defendant's products.

### II.

Mr. Clark was employed by Glidden from October of 1949 through July 31, 1983. At no time did the plaintiff have a written employment contract. From 1957 onward, the plaintiff was compensated via a base salary and sales bonus incentives.

### III.

Glidden is organized into various departments, such as "Industrial Sales", "Trade Sales", and "Chemical Coatings". Prior to 1974, Mr. Clark was variably designated as a Chemical Coatings Department/Industrial Sales Department employee, classified as a chemical coatings salesman and/or industrial maintenance salesman. In 1974, the plaintiff and his fellow marine sales employees were transferred into the Trade Sales Department.

### IV.

Marine Sales occupied a unique niche in the above structure. Although it is disputed whether Marine Sales was a distinct department or merely a division of the larger department under whose auspices it operated, and by whom its profits were calculated, the evidence established that there were many unique features of marine sales. In particular, the marine sales business possessed the following unique characteristics:

(1) The sales territory was worldwide, not geographically restricted as were other sales groups;

(2) The number of potential customers were limited due to the unique products;

(3) The average sales volumes produced via marine sales was substantially higher than other sales areas;

(4) The products in the marine market required special application and treatment; and

(5) The application process necessitated technical support.

### V.

William Clark represented himself as a member of the Marine Sales Department, and was considered a member thereof by his customers, fellow employees, and management.

### VI.

During the time period pertinent to this litigation, compensation for Glidden paint sales employees was based on a combination of wages and bonuses. The bonuses

were calculated on a fiscal year beginning as of July 1 and ending as of June 30. There were many different sales incentive programs used in the Glidden company, depending on the department. For instance, there was a Chemical Coatings Incentive Compensation Plan as well as a Painter-Maintenance Incentive Program.

### VII.

Following the transfer of the marine salesmen to the Trade Sales Department, the program by which Mr. Clark was initially compensated was the Painter Maintenance (P–M) Incentive Program. Although Mr. Clark contends Mr. O'Halloran, his supervisor, advised him that this was the plan via which he would always be compensated, there is no independent or corroborative evidence of this. In the years following, the incentive program applicable to Bill Clark was altered several times.

### VIII.

Mr. Clark was paid under the P–M Incentive Program from FY 1975 to FY 1978, and claims he had a right to continue in this program, even though he accepted bonuses under new plans. For example, plaintiff Exhibit 46 shows that on October 24, 1979, in a letter signed by Mr. Clark, he was presented with a different plan for fiscal year 1980, retroactive to July 1, 1979, the start of the fiscal year. Mr. Clark went into the hospital shortly after signing this, for removal of appendix and gallstones, and now claims that he found out only after getting out of the hospital that the new plan was different from the P–M Incentive Plan.

### IX.

In September 1980 plaintiff was designated as a Chemical Coating Specialist 1A, but did not sign this, or the letters of employment sent to him each year prior to his voluntary retirement on July 31, 1983. He continued to be compensated on the basis of the 1979 agreement, which he had signed. Mr. Bender, the Regional Director, states that Mr. Clark never told him why he was retiring, nor did plaintiff mention that the P–M Program was involved.

### X.

Mr. O'Halloran, former Regional Sales Director, retired in 1979, and his testimony is not in the record, because he has died. However, Mr. Clark admits that O'Halloran never put in writing that plaintiff was in the P–M Program, nor did Mr. Clark put in writing that he was opposed to changes or had any complaints regarding his compensation plan.

### XI.

In 1979, at a trial in New Orleans Federal Court, in which Glidden's Chief Counsel, (Jack Meader), was present, Mr. Clark explained his complaint regarding the manner in which he was being compensated. Mr. Meader was sympathetic, but only promised to present it to the company on his return to corporate headquarters. However, nothing came of this and Mr. Clark continued to accept payments under the new plan.

### XII.

The basic question posed by this case is whether Glidden, by changing Mr. Clark's incentive plan, committed an "abuse of right" so as to make Glidden liable for the difference in commissions under the P–M Incentive Program and the new contract signed by Mr. Clark on October 24, 1979.

Mr. Clark is an intelligent man, and was recognized as the number one salesman of Glidden in several of the years of his employment. Although he had discussed other departmental problems with company officials on several occasions which resulted in changes, nothing was done to reinstate him under the P–M Incentive Program. In fact, he accepted all payments under the new program, and did not file suit until after his voluntary retirement in 1983.

### XIII.

The testimony was undisputed that Mr. Clark was an industrious and valuable em-

ployee, who was one of, if not the best salesman with Glidden. Indeed, Bill Clark was the recipient of numerous awards and honors, and was cited as a model for other salesmen to emulate. It was also undisputed that Mr. Clark was among the highest paid salesmen at Glidden. His base salary was higher than most salesmen for their range of salaries, and coupled with his sizable bonuses, Mr. Clark was earning substantial income.

The testimony established, that for FY 1982, the plaintiff earned more under his personalized incentive program than he would have under the P–M plan. It was also established that Mr. Clark's income showed a consistent rise during the years in question.

## CONCLUSIONS OF LAW

Plaintiff does not claim, nor does there appear to be a basis in law or fact for a claim by plaintiff pursuant to the Fair Labor Standards Act, 29 U.S.C. § 213 or La. R.S. § 23:631. Rather, the sole remedy sought by plaintiff is under the general Civil Code Articles governing employment relationships. As mentioned, Mr. Clark seeks compensation for Glidden's "abuse of right" and his detrimental reliance upon the employment relationship.

Cueto-Rua, "Abuse of Rights," 35 *Louisiana Law Review* 965 (1975) contains an excellent analysis of the abuse of rights doctrine. Prof. Cueto-Rua discussed that the development and basis for this doctrine, and suggests that there are several categories into which abuse of rights may fall, and are as follows:

(1) Exercise of a right with the intent to harm;

(2) Exercise of a right without any legitimate and serious interest;

(3) Exercise of a right against *bonos mores*, or moral rules, or good faith; and

(4) Exercise of a right contrary to the aims on account of which said right or power was conferred.

Prof. Cueto-Rua also concludes that, while of more substantial import in other civil law systems, "abuse of right" has been recognized in Louisiana. 35 La.L. Rev. at 1004.

The abuse of right doctrine has been applied sparingly in Louisiana, and only in cases where there is (1) proven an intent to harm, or a predominant motive to cause harm, or (2) where it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection. *Illinois Central Railroad Company v. International Harvester Co.,* 368 So.2d 1009 (La.1979). The evidence fails to meet this burden, and does not show bad faith or a violation of the rules of elementary fairness. Accordingly, this Court has no basis to reform the contract between the parties, or to grant Mr. Clark an award of commissions for which he did not bargain, and which he indisputably knew he was not entitled to receive under the compensation plan designated for him. This view is reinforced by his own efforts, albeit minimal, to have his contract revised during the last years with Glidden.

The doctrine of "detrimental reliance" is recognized in Louisiana in accordance with Article 1967 of the Louisiana Civil Code.[1] However, the Court does not find any statement, act, or contract upon which Mr. Clark relied to his detriment. The nearest act to which he can point is his conversation with the General Counsel, Jack Meader, who only promised Mr. Clark to have his case reviewed when Mr. Meader returned to company headquarters after the New Orleans trial. Additionally, there is no evidence as to an understanding between Clark and O'Halloran, as the plain-

---

1. Art. 1967. Cause defined; detrimental reliance

Cause is the reason why a party obligates himself.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

tiff asserts, that he would always be paid on the P–M plan.

Should the Court decide in favor of Mr. Clark, the practical effect would be that every lack of promotion, re-classification, change of duties, or other such act by a company towards its employees, would be subject to an "abuse of rights" complaint. This would indeed establish a dangerous precedent. The extension of the doctrine in this manner is not supported by the law or the jurisprudence, and to so interpret the present facts in such a manner would be a type of judicial activism for which there is no justification. The Court thus concludes that Mr. Clark has no legally cognizable claim for past bonuses, and likewise no concurrent adjustment in retirement or stock benefits.

### "Abuse of Rights" Doctrine in Louisiana

The notion of abuse of rights, as noted by Prof. Cueto Rua, is well established in civilian jurisdictions. The best known French case is the *Clement-Bayard* affair, decided by the Court of Cassation, Req., August 3, 1915, D.P. 111.1917.1.79, in which Coquerel had bought a tract of land in front of a parcel used by Clement-Bayard as a hangar for dirigibles. Coquerel offered his land to Clement-Bayard at a nice profit, and when the latter refused, Coquerel built two fences with steel spikes two to three meters high. During a high wind, one of Clement-Bayard's dirigibles had been pierced by a spike. The Court found an abuse of right here and ordered Coquerel to dismantle the spikes and fences and to pay damages.

The abuse of rights doctrine, seldom utilized in Louisiana, has most frequently been invoked in situations involving "nuisance" usages of land, pursuant to the Louisiana Civil Code, Articles 667 and 669.[2] *See, e.g., Hero Lands Company v. Texaco,*

*Inc.,* 310 So.2d 93 (La.1975). It has also been analyzed in the context of a lease, wherein the lessor denies the lessee the right to sublease the premises. *See, e.g., Ross E. Cox v. Claude Kirkpatrick,* 404 So.2d 999 (La.App. 1st Cir.1981); *Illinois Central v. International Harvester,* 368 So.2d 1009 (La.1979). Rarely has the doctrine sought to be invoked to reform an employment contract.

However, in *Morse v. J. Ray McDermott,* 344 So.2d 1353 (La.1977), employment related activities were at issue in an abuse of rights case. Morse was terminated, after working for McDermott from 1958 to 1970, as a result of an economic downturn and not because of any misconduct. In 1966 he had joined the company's supplemental compensation plan, under which McDermott contributed certain funds which could be awarded by a committee to deserving employees. Morse received four awards, payable in five annual installments, several of which were unpaid at the time of his termination. The clause in controversy permitted the committee in its discretion to waive a provision under which such payments were forfeited upon termination. The company was indirectly benefitted by making these funds available for awards to its other employees. The Court, at 1367, held that these forfeiture provisions were invalid under La.R.S. 23:634 prohibition against wage forfeiture, as interpreted in the light of La.Civil Code Article 2040 (now Art. 1772).[3] The Court thus found an abuse of right in the denial to the plaintiff of the funds. At 1369, the Court stated:

> The exercise of a right (here, to discharge an employee while opting not to waive the non-termination requirement) without legitimate and serious interest, even where there is neither alleged nor proved an intent to harm, constitutes an abuse of right which courts should not countenance. *Higgins Oil & Fuel Co. v.*

---

2. See La.Civil Code Article 667, SIC UTERE TUO UT ALIENUM NON LAEDAS.

 "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.

3. Art. 2040. Party bound preventing performance—Condition fulfilled. The condition is considered as fulfilled, when the fulfillment of it has been prevented by the party bound to perform it.

*Guaranty Oil Co.*, 145 La. 233, 82 So. 206 (1919).

Thus, the otherwise permissible exercise of a legal right to discharge, in the situation where the employer has the discretion to obviate the harsh forfeiture consequence and chooses not to do so, is transformed from a legal right to an abuse of that right.

In its analysis, the Court in *Morse* rejected the argument, advanced by the defendant, that Civil Code Article 2040 (present Article 1772) was inapplicable because of the "legal right" exception. This exception was discussed in *Onorato v. Maestri*, 173 La. 375, 137 So. 67 (1931), but the Court held that it was unavailing to McDermott because of overriding considerations of justice and fair play and the strong public policy against wage forfeitures.

Although *Onorato v. Maestri* is cited as an "abuse of rights" case, this Court views the case more in the category of such cases as *Womack Agencies v. Fisher*, 86 So.2d 732 (La.App. 1st Cir.1954), wherein the Court found that Fisher had sold to a purchaser which Womack Agencies had secured during the term of the real estate listing and awarded the realtor his fee. In *Onorato*, the realtor had secured a fifteen year lease for the owner, which was rescinded by the Court when lessee went into receivership. However, the owner then leased the premises to the Receiver for the same rent, and the Court held that the realtor's commission was protected.

In *Illinois Central Gulf Railroad v. International Harvester Co.*, 368 So.2d 1009 (La.1979), the Court stated that the "abuse of rights" doctrine was recognized in *Morse v. McDermott* but "has been invoked sparingly in Louisiana." That "in its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm." *See* Prof. Cueto-Rua's Article in 35, La.L. Rev. at 990. Harvester had urged the Court that Illinois Central Gulf exercised its right to withhold consent to sublease in an abusive manner, but the Court held as a matter of fact that Illinois Central Gulf had bargained in good faith, that its act was based upon a legitimate motive, and that it was plainly not against moral rules or elementary fairness.

After a careful review of the evidence, the Court concludes that the record is bereft of any "abuse of right" by Glidden, or any evidence of an action by Glidden upon which Bill Clark relied to his detriment. Certainly, Glidden is held to a standard of dealing with its employees in good faith, but there is no evidence that they have not done so with Mr. Clark.

In the case at bar, there is no evidence that Bill Clark was to be paid on the P–M sales incentive program. Mr. Clark, indeed, was aware that he was not being compensated under the P–M plan. Given the unique nature of the plaintiff's position in the company, coupled with the distinctive features of marine sales, a decision to compensate Mr. Clark in a different manner seems neither arbitrary nor capricious, and certainly not malicious.

While it may be true that the services of the plaintiff were of such a valuable nature to the company that he *deserved* to be compensated at a higher level, that does not concomitantly mean that he is legally *entitled* to receive additional compensation. Mr. Clark's remedy for what he perceived to be mistreatment by Glidden was not to seek redress in the Courts, but rather, he should have directly confronted his superiors with his demands. Had Mr. Clark brought his complaints to management in a forthright manner, they may have been addressed. Instead, he choose to accept the compensation offered him throughout the years in question. Thus, hostile feelings arose, Mr. Clark terminated his long employment relationship with Glidden, and this litigation resulted.

In addition to dissatisfaction with the mode of compensation, the Court also surmises that what further inflamed the situation were personality conflicts and a perceived lack of interest by Glidden in the unique needs of the marine sales depart-

ment. Again, these are problems which might have been addressed had they been brought to management's attention in a more forthright manner.

While it is a credit to Bill Clark that he was so dedicated to his job, his hesitancy to confront his superiors and possibly create a disturbance unfortunately worked to his detriment. Conversely, it may be that Glidden itself failed to adequately maintain open communication with its employees. However, in neither event are Mr. Clark's claims herein legally viable.

In light of the foregoing, IT IS ORDERED that judgment will be entered against the plaintiff and in favor of the defendant, dismissing the plaintiff's claims for past compensation.