**FOURCHON DOCKS, INC., Plaintiff-Appellee Cross-Appellant,**

v.

**MILCHEM INCORPORATED and Milpark, Defendant-Appellant Cross-Appellee.**

No. 87–3342.

United States Court of Appeals, Fifth Circuit.

July 27, 1988.

Donald B. Ensenat, Catherine Maureen Blackburn, New Orleans, La., for defendant-appellant, cross-appellee.

Bernard L. Knobloch, Jr., F. Smith Knobloch, Thibodaux, La., for plaintiff-appellee, cross-appellant.

L. Charles Caillouet, Stephen E. Caillouet, Thibodaux, La., for Caillouet Land Corp.

Before WISDOM, GEE, and JONES, Circuit Judges:

EDITH H. JONES, Circuit Judge:

This diversity case involves the breach of an anti-sublease provision in a Louisiana property lease. The district court awarded the accelerated rent as damages for breach, but fixed attorneys' fees considerably less than would have been provided by the lease. Both sides appeal.

## BACKGROUND

In 1981, a lease on an unimproved tract of land in LaFourche Parish, Louisiana between Caillouet, Inc., ("Caillouet") as lessor, and Joseph Blanchard, as lessee, was assigned to Fourchon, Inc. ("Fourchon"). With the consent of Caillouet, a portion of this tract was subleased by Fourchon to "Milchem," [1] a drilling fluids sales and distribution concern. The Fourchon/Milchem sublease contained a provision governing subleases which stated:

> Sublessee shall not have the right to assign or sublease the subleased premises, in whole or part, without the prior written consents of Sublessor and the owner, Caillouet Land Corporation, which consent will not be withheld unreasonably.

On February 15, 1986, Milchem subleased the property to Chromalloy Land Corporation ("Chromalloy") without notice to, or the consent of, Fourchon or Caillouet. A week later, Chromalloy cancelled a lease it had entered with Fourchon in 1984 on property adjacent to the site at issue here. Fourchon received notice of the sublease to Chromalloy on March 3 and consequently sent written notice to Milchem of its breach of the Fourchon/Milchem sublease, demanding, as provided in the sublease, that

---

1. In 1985, after the sublease was executed, Milchem, Inc. merged with Nupark, Inc. and the resultant entity, Milpark, Inc., entered into a subsequent sublease of the property which gave rise to the present lawsuit. Both Milchem, Inc. and Milpark, Inc. are named as defendants and will be referred to collectively herein as "Milchem."

Milchem cure the breach within 10 days. On May 12, Milchem and Chromalloy attempted to secure Fourchon's consent to the sublease. Fourchon refused.

On July 7, Fourchon brought this action in state court, seeking a declaration that the Milchem/Chromalloy sublease was void and damages of $1,080,000, representing the sum of the accelerated rental payments. On July 14, at the request of Fourchon, a writ of sequestration was issued in the state court proceedings to seize movable property located on the sublease property in enforcement of Fourchon's lessor's privilege. The sheriff seized the movables subject to the sequestration by placing a lock on the gate to the property.

By letter dated August 14, 1986, Milchem notified Fourchon that it was terminating the Fourchon/Milchem sublease because Fourchon had evicted Chromalloy by denying it access to the sublease premises. Fourchon informed Milchem that Chromalloy had not been evicted but had instead abandoned the site. Fourchon also at this time affirmed the right of Milchem to occupy the site, and offered Milchem the keys to the property.[2]

On August 6, 1986, this action was removed to federal district court. Thereafter Milchem counter-claimed against Fourchon and Caillouet, seeking damages for cancellation of the Fourchon/Milchem sublease. Alternatively, Milchem asked for a declaration that Fourchon and Caillouet had approved the Milpark/Chromalloy sublease.

The district court ruled in favor of Fourchon, awarded damages in the amount of $1,080,000, declared the Milchem/Chromalloy sublease void, ordered that $157,000 of Fourchon's damages be awarded to Cail-

louet, and awarded attorneys' fees to Fourchon as stipulated in the Fourchon/Milchem sublease. After a subsequent hearing on attorneys' fees, the fee award was reduced to $51,750.00, the "reasonable value" of legal services rendered to Fourchon in connection with this litigation. Both parties appeal.

## I.  APPEAL OF MILCHEM

Milchem urges that (1) its *ex post facto* attempts to gain Fourchon's consent to the sublease were sufficient to cure the breach in accordance with the opportunity-to-cure provision in the Fourchon/Milchem sublease;[3] (2) consent by Fourchon to the Milchem/Chromalloy sublease was unreasonably withheld in violation of the Fourchon/Milchem sublease; (3) even if consent was reasonably withheld, acceleration of the rent due under the Fourchon/Milchem sublease was not authorized by the sublease, the proper remedy instead being avoidance of the Milchem/Chromalloy sublease; and (4) although Fourchon may have been legally justified in obtaining a writ of sequestration, the manner in which the writ was executed—by locking the gate to the premises—denied access to the property and thereby dissolved the lease.

### A.  Fourchon's Refusal to Consent to Milchem/Chromalloy Sublease

■ The first issue consists of two subissues: (1) whether Milchem's efforts to cure the breach were timely and appropriate under the sublease's cure provision, and, if so, (2) whether Fourchon was legally justified in withholding consent to the

---

**2.** The site remained vacant until June 22, 1987, when Milchem, having lost in the district court, returned to the property.

**3.** Paragraph 13 of the Fourchon/Milchem sublease provides:

There shall be no forfeiture of the sublease and lessor shall have no right to cancel this sublease or take any other action under its terms for a breach of sublessee's obligations under the sublease, whether for non-payment of rent or otherwise, unless sublessor shall first furnish written notice of the claim to breach to sublessee giving sublessee at least

five (5) days after sublessee's receipt of such notice (for failure to pay rent) or at least ten (10) days after sublessee's receipt of such notice (for any other breach of sublessee's obligations) within which to comply or cure any such breach, or, if any such breach is of a nature which cannot be complied with or cured in such a period, then unless sublessee shall have commenced such compliance or curing of any such breach within such a ten (10) day period and shall continue such actions with diligence and continuity thereafter.

sublease.[4]

The cure provision, quoted *infra* at footnote 3, requires that efforts to cure any breach other than a failure to pay rent must at least be *commenced* within 10 days of the sublessor's written notice of the claimed breach. Milchem, however, attempted no curative action until long after the cure period expired.[5]

■ Not only was the attempt to cure untimely, it was also undertaken by inappropriate means. As the district court stated, allowing a post-breach effort at obtaining approval of a sublease to suffice as a cure would render meaningless the sublease's advance approval requirement. Milchem urges that seeking consent *ex post facto* was its only means of cure, the denial of which essentially removes the opportunity-to-cure provision from the sublease. This assertion is erroneous. The cure provision is fully applicable to numerous possible breaches of the lease besides this one. Moreover, Milchem could have terminated its sublease agreement or sought a judicial declaration that the sublease was void in order to bring itself back into compliance with the contract. Thus, the failure of Milchem's curative efforts is simply a matter of too little, too late.

■ Additionally, the district court's determination that Fourchon did not unreasonably refuse to consent was not incorrect. Section 2725 of the Louisiana Civil Code allows a lessor to prohibit subleasing in these terms:

The lessee has the right to underlease, or even to cede his lease to another person, unless the power has been expressly interdicted.

The interdiction may be for the whole, or for a part; and this clause is always construed strictly.

In *Illinois Cent. R. Co. v. International Harvester,* 368 So.2d 1009, 1013 (La.1979), the Louisiana Supreme Court, interpreting this language, stated:

The article is not clear as to whether a clause expressly interdicting the lessee's right to sublease is to be construed strictly for or against the lessee. However, this Court has said that "[t]he language is taken literally from the Napoleon Code; and the interpretation which it appears to have uniformly received in France … is that the prohibition must be *construed strictly against the lessee." Cordeviolle v. Redon,* 4 La.Ann. 40 (1849) [emphasis added].

More recently, the state Supreme Court has qualified *Illinois Central,* holding that, "when a lease contains the additional proviso that the lessor's consent may not be unreasonably withheld, the lessor's right to refuse will be judicially protected unless the lessor's refusal was unreasonable." *Truschinger v. Pak,* 513 So.2d 1151— (La.1987), citing *Caplan v. Latter & Blum,* 468 So.2d 1188 (La.1985).[6]

The district court found three reasonable bases for withholding consent to the sub-sublease: (1) the economic loss resulting to Fourchon from Chromalloy's termination of its lease on adjoining property; (2) Chromalloy's unwillingness, at the request of Fourchon, to delineate the specific activities to be conducted on the premises; and (3) the possible property devaluation resulting from a short-term sublease. We agree with the district court that taken together Fourchon had reasonable grounds for denying its consent.[7] Consequently, the district

---

4. The district court decided the second issue even though it found that Milchem's efforts to cure were insufficient.

5. On March 14, 1986, Milchem received written notice of the breach. Milchem never sought to cancel the Milpark/Chromalloy sublease. It was approximately May 12, 1986, before Milchem submitted the sublease to Fourchon for approval. Milchem requested Caillouet's approval by letter dated July 9, 1986. Milchem did not seek a judicial determination that Fourchon and Caillouet had unreasonably withheld

consent until August 15, 1987 when it answered Fourchon's complaint.

6. *But see* Comment, *The Right to Sublease,* 53 Tul.L.Rev. 556 (1979), for a persuasive argument that article 2725 was mistranslated from article 171 of the Code Civil of France.

7. Almost all of the cases cited by Milchem addressing what constitutes unreasonable withholding of consent are decisions of other states' courts and are factually distinguishable. The few Louisiana cases on this subject are likewise

court's finding that consent was not unreasonably withheld is not clearly erroneous.

### B. Acceleration of Rent

■ The district court found that Milchem breached the Fourchon/Milchem sublease both by failing to obtain consent for the Milchem/Chromalloy sublease and by ceasing its rental payments as of August 1, 1986.[8] However, the court's acceleration of the rent for the remainder of the rental term appears to have been based solely on the nonpayment of rent. Milchem urges that the district court erred in ordering acceleration because (1) Fourchon unreasonably withheld consent and therefore Milchem's actions did not constitute a breach of the sublease, or, alternatively, (2) even if consent was not unreasonably withheld, acceleration was improper because the ineffective cure would have rendered the Milchem/Chromalloy sublease void, which would have resulted "automatically" in the cure of the Fourchon/Milchem contract.[9] Milchem's first argument is unavailing because we have found that approval was not unreasonably denied. Its second argument fails because even if the Milpark/Chromalloy sublease was ineffectual, Milchem's execution of the sublease still constitutes a breach of its sublease with Fourchon. Holding otherwise would endorse an absurd proposition: that violating an anti-sublease provision would never constitute a breach. Furthermore, Milchem's nonpayment of rent is an additional and independent justification for acceleration of the rental payments. The district court did not err in authorizing acceleration of rental payments due under the Fourchon/Milchem sublease.

### C. The Writ of Sequestration

■ On July 14, 1987, a writ of sequestration was granted and the Fourchon/Milchem leased premises were seized. Fourchon sought the writ after being advised by Chromalloy on July 11 that it was shutting down its drilling fluids facility and after being informed by Fourchon employees that material was being transported onto barges from the site. Fourchon's alleged purpose for obtaining the writ was to prevent vandalism on the abandoned site. Milchem does not contest Fourchon's legal right to the writ, but instead objects to the manner in which the writ was executed—namely, by padlocking the gate to the premises (presumably, as opposed to more "appropriate" means such as placing a guard on the premises to prevent the removal of movables).[10]

According to the Louisiana Civil Code, a lessor may not disrupt the peaceable possession of the leased premises during the lease period. La.Civ.Code art. 2692. In *Henry Rose Mercantile & Mfg. Co. v. Stearns*, 154 La. 946, 98 So. 429 (1923), the Louisiana Supreme Court stated that a lessor who seeks a writ of sequestration

of little guidance. *See, e.g., Maurin-Ogden–1978 Pinhook Plaza v. Wiener*, 430 So.2d 747 (La.App. 5th Cir.1983); *Associates Commercial Corp. v. Bayou Management, Inc.*, 426 So.2d 672 (La. App. 1st Cir.1982); *Cox v. Kirkpatrick*, 404 So.2d 999 (La.App. 1st Cir.1981); *Gamble v. New Orleans Housing Mart, Inc.*, 154 So.2d 625 (La.App. 4th Cir.1963), *writ ref.*, 244 La. 1027, 156 So.2d 299.

8. The district court's order of March 18, 1987 provides in pertinent part:

It was also a clear violation of the lease ... for Milchem to cease paying rent as of August 1, 1986. Milchem could have protected its contention that the sequestration resulted in a breach by Fourchon by paying the rentals thereafter into the registry of the court and by seeking a declaration that it was no longer bound to pay rentals. This would have protected Milchem against the acceleration and attorney fee clauses in the lease. Instead, consistent with its earlier attitude that it could sublease without prior consent, despite the lease provision to the contrary, Milchem decided simply to cease paying rent. Having done so, it must now honor its contractual obligation to pay the entire rent for the remaining term of the lease.

9. Milchem does not contend Fourchon's damages should be reduced in an amount equal to the property seized by Fourchon. This argument would seem foreclosed because Fourchon apparently allowed Chromalloy to remove its movables from the premises three days after the writ was executed, and thus did not retain possession of the property.

10. Fourchon's contention that the sheriff did, in fact, place a guard on the site as keeper has no record support.

should exercise ordinary caution in seeing that his lessee's possession is not "unnecessarily disturbed." 98 So. at 430. Under Louisiana law, a denial of access to leased premises by virtue of a writ of sequestration constitutes a disturbance of peaceful possession and thereby dissolves the lease. *See, e.g., Henry Rose,* 98 So. 429; *Pylate v. Inabnet,* 458 So.2d 1378 (La.App. 2d Cir. 1984); *LeBrum v. Hill,* 452 So.2d 814 (La. App. 3rd Cir.1984). The issue here, then, is whether the sheriff's action in padlocking the gate, a method of execution neither directed nor ratified by Fourchon, constituted a denial of access attributable to Fourchon, so as to terminate the lease.

Milchem urges that locking the gate *prima facie* denies access. There is intuitive appeal to the proposition that physically preventing entry to the property constitutes a denial of access. Further, some Louisiana decisions suggest that a lessor bears the ultimate responsibility for protecting the lessee's peaceable possession under such circumstances. *Id.* What is troublesome in this case, however, is that Milchem never attempted to gain access to the premises until June of 1987, notwithstanding Fourchon's having offered the gate keys to Milchem approximately one month after the writ was executed.[11] Apparently relying on the hope that denial of access would be assumed by the fact of the locked gate, Milchem introduced no evidence at trial to demonstrate that Milchem or Chromalloy were actually denied access to the premises or were in any other way disturbed in their possession. We are aware that Louisiana law does not require a lessee to act *affirmatively* to protect its right to peaceful possession. *Cf. Henry Rose,* 98 So. at 430. However, we are also convinced, as the court found, that Milchem's use of the leased premises was not unreasonably interfered with. The site had become abandoned and unused at the time of sequestration, and a subsequent offer to provide Milchem with keys, and thus access, to the premises, was ignored. Under these circumstances, the writ of sequestration did not bring about an eviction.

The cases cited by Milchem in support of its position are all distinguishable. In *Henry Rose,* the lessee was *dispossessed* of the premises by the sheriff and expressly denied repossession by the lessor. The court, in finding an eviction, stated:

> In the case at bar, as we have observed, the plaintiff gave its sanction to the sheriff's executing the writ in the manner in which he did, by refusing to direct that official to remove the property seized, when it was in plaintiff's power to have thus directed the sheriff, and by *refusing to restore the defendant to the possession of the premises,* pending the seizure.

98 So.2d at 430 (emphasis added).

In each of the other cases cited by Milchem, the locking of leased buildings pursuant to a writ resulted in the physical ouster of the lessee and denial of future access. *Pylate v. Inabnet,* 458 So.2d 1378; *LeBrum v. Hill,* 452 So.2d 814; *Maggio v. Price,* 1 So.2d 404 (La.App. 1st Cir.1941); *Pirkle & Williams, Inc. v. Shreveport Jitney Jungle, Inc.,* 140 So. 837 (La.App. 2d Cir.1932). Milchem goes too far in interpreting these cases to say that a locking of leased premises *automatically* constitutes the denial of access.

Thus, we conclude that the writ of sequestration did not bring about a dissolution of the lease.

## II. CROSS–APPEAL OF FOURCHON

■ Fourchon raises several points of error on cross-appeal with respect to the district court's reduction of its attorneys' fee award from $216,000 to $57,750. The initial award was based on the applicable Fourchon/Milchem sublease provision[12],

---

11. By letter dated August 19, 1986, Fourchon through its counsel informed Milchem that it had not evicted Milchem or Chromalloy from the leased premises and that the keys to the site were available upon request. Plaintiff's Trial Exhibit 18.

12. That provision states:
    ... Should it become necessary for sublessor to retain an attorney at law for the purpose of collection of monies due under the provisions of this sublease, sublessee agrees and binds itself to pay additionally twenty percent (20%) of the amount due and owing.

while the final award represented the court's finding of a reasonable sum owed for the hours worked by Fourchon's attorneys.

Fourchon first argues that the district court lacked jurisdiction to review its contractual fee agreement because, alternatively, (1) Louisiana law prohibits judicial inquiry into the reasonableness of attorney fees fixed by party agreement, or (2) any authority for such action belongs exclusively to the Louisiana Supreme Court and does not extend to cases involving contractual agreements between nonattorney parties.

Over the course of the last decade, the Supreme Court of Louisiana and the Louisiana legislature have not seen eye-to-eye on whether the courts may inquire into the reasonableness of attorney fee awards fixed by party agreement. In 1982, the Louisiana Supreme Court held that such inquiry was permissible. *See Leenerts Farms, Inc. v. Rogers*, 421 So.2d 216 (La. 1982). In 1983, however, the Louisiana legislature amended the Louisiana Civil Code to overrule *Leenerts Farms*. The Louisiana Supreme Court has since held that it possessed, by state constitutional grant, the authority to override this legislative action and reasserted the right of the judiciary to inquire into the reasonableness of attorney fee agreements and to refuse enforcement when the agreed fee is excessive. *City of Baton Rouge v. Stauffer Chemical Co.*, 500 So.2d 397 (La.1987), *on remand sub nom. McNamara v. Stauffer Chemical Co.*, 506 So.2d 1252 (La.App. 1st Cir.1987); *Central Progressive Bank v. Bradley*, 502 So.2d 1017 (La.1987), *on remand*, 506 So.2d 711 (La.App. 1st Cir. 1987). In *Central Progressive Bank*, the court reiterated its holding from *Leenerts*

*Farms* that, because of a prohibition in Louisiana's Code of Professional Responsibility against a lawyer's collecting a "clearly excessive fee," [13] courts may inquire into the reasonableness of a fee. 502 So.2d at 1017. Because the most recent Louisiana Supreme Court authority permits judicial inquiry into the reasonableness of attorney fees awarded pursuant to agreement, we find that the district court was justified in its review and reduction of the fee award.[14]

Fourchon's other jurisdictional arguments are likewise unsupported in Louisiana case law. Fourchon's interpretation of Art. 5, § 5(B) of the Louisiana Constitution of 1974, which grants the Louisiana Supreme Court "exclusive original jurisdiction of disciplinary proceedings against a member of the bar," as precluding inquiry into the propriety of attorneys' fees by lower courts has not been espoused by any Louisiana court. On the contrary, the authority of lower courts to regulate the practice of law has never been challenged on this basis, and has been affirmed at least implicitly in several decisions. *See, e.g., Leenerts Farms*, 421 So.2d at 219 ("*courts* may inquire into the reasonableness of [attorney's fees]") (emphasis added); *Central Progressive Bank* at 1017, (quoting same language). *See also Moody v. Arabie*, 498 So.2d 1081 (La.1986); *Walker v. Investment Properties, Ltd.*, 507 So.2d 850, 853 (La.App. 5th Cir.1987); *Fowler v. Jordan*, 430 So.2d 711, 716 (La.App. 2nd Cir.1983).

■ Fourchon further asserts that the stipulated fees belong to Fourchon, and not its attorneys, and that the state Supreme Court has no power to regulate fees between nonattorneys. "The Louisiana Supreme Court does not have constitutional authority to control contractual agree-

---

**13.** The pertinent provision of the then applicable Louisiana Code of Professional Responsibility provided in DR 2–106:

  A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

State Bar Articles of Incorporation, Art. 16, Code of Prof.Resp., DR 2–106(A), LSA–R.S. foll. 37:219.

On January 1, 1987, the Rules of Professional Conduct were enacted to replace the Code of

Professional Responsibility. Rule 1.5 thereof, which provides simply that "A lawyer's fee shall be reasonable," replaced DR 2–106 of the Code of Professional Responsibility.

**14.** Contrary to Fourchon's assertion, there is no meaningful distinction between the facts of *Leenerts Farms* and *Central Progressive* and those of the instant case. The Louisiana Supreme Court's holdings in those cases were broad enough to encompass the agreement here.

ments between nonattorney parties; this power is vested in the legislative branch of State government." *Central Progressive Bank v. Bradley*, 496 So.2d 525, 532, *rev'd on other grounds*, 502 So.2d 1017 (La. 1987). *See also* La. Const. of 1974, art. III, § 1. The only Louisiana court to consider the ownership of stipulated attorneys' fees in the wake of *City of Baton Rouge* and *Central Progressive Bank* held, however, that "the amount of such ... fees does not accrue to the creditor, but accrues instead to the attorney and is thus subject to court regulation." *Walker v. Investment Properties, Ltd.*, 507 So.2d at 853. This proposition draws inferential support from *Central Progressive Bank*, in light of the state Supreme Court's reversal in that case of the lower court's decision that the attorney fee stipulated in a property mortgage note was owned by the Bank, and not its attorneys. We thus conclude that the district court's decision to review the reasonableness of Fourchon's attorney's fees was not improper.

■■■■ Fourchon also challenges the district court's method of calculating a reasonable fee. Fourchon urges that the court erred in fixing a "reasonable amount" rather than a "maximum reasonable amount," and that it failed to consider all the factors listed in Rule 1.5(a) for determining attorneys' fees. The case law is bereft of authority requiring the fixing of a "maximum reasonable" fee, but instead equates nonexcessiveness with reasonableness. *See, e.g., Central Progressive Bank*, 502 So.2d at 1017. Similarly, Rule 1.5 of the Rules of Professional Conduct requires that a lawyer's fee be "reasonable" and then lists factors to be considered in determining "reasonableness." The trial court's apparent formula for calculating the final fee award, multiplying the attorney hours worked by an hourly rate it deemed reasonable, did not abuse the broad discretion accorded him in setting fees. *Cf. Moody v.*

*Arabie*, 498 So.2d at 1086. We also find no error in his failure expressly to consider all eight § 1.5(c) factors because the language of that provision as well as the interpretive state court decisions have held that the guidelines are permissive and that consideration of them all is not mandatory.[15]

For these reasons, the decision of the district court is AFFIRMED.

---

**15.** Rule 1.5(a) of the Rules of Professional Conduct provides in part:

> A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee *include* the following ... (emphasis added)

Cases indicating these factors to be permissive guidelines only include *Leenerts Farms*, 421 So. 2d at 219 and *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102, 110–111 (La.1979).